UNCLASSIFIED

# NATIONAL GANG REPORT



# 2015

## GANGS

## NATIONAL GANG INTELLIGENCE CENTER

UNCLASSIFIED

UNCLASSIFIED

UNCLASSIFIED

(U) The 2015 National Gang Report (NGR) presents an overview of current gang activities and trends in the United States. Intelligence in this report is derived primarily from a survey administered by the National Alliance of Gang Investigators' Associations (NAGIA) and from a second survey on Safe Streets and Gang Task Forces administered by the FBI Safe Streets and Gang Unit (SSGU). The quantitative data herein is supplemented by qualitative open source reports and reporting from federal, state, local, and tribal law enforcement from across the nation.

UNCLASSIFIED

UNCLASSIFIED

UNCLASSIFIED

# (U) TABLE OF CONTENTS

• Preface. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

• Scope and Methodology . . . . . . . . . . . . . . . . . . 5

• National Gang Intelligence Center . . . . . . . . . . 6

• National Alliance of Gang
   Investigators' Associations . . . . . . . . . . . . . . . 7

• Executive Summary . . . . . . . . . . . . . . . . . . . . . . 8

• Key Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

• Street Gangs. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   • Membership . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   • Criminal Activity . . . . . . . . . . . . . . . . . . . . . . 12

      • Drug Distribution . . . . . . . . . . . . . . . . . . . 12

      • Intimidation/Threats . . . . . . . . . . . . . . . . . 12

      • Financial Crimes . . . . . . . . . . . . . . . . . . . . 12

   • Alliances and Rivalries . . . . . . . . . . . . . . . . . 12

   • Trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      • Threats to Law Enforcement. . . . . . . . . . 13

• Prison Gangs . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   • Membership . . . . . . . . . . . . . . . . . . . . . . . . . 15

   • Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   • Criminal Activity . . . . . . . . . . . . . . . . . . . . . . 16

      • Smuggling . . . . . . . . . . . . . . . . . . . . . . . . . 18

      • Drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   • Trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      • Corruption of Prison Staff . . . . . . . . . . . 19

      • Measures of Open Concealment . . . . . 21

      • Female Prison Representation . . . . . . . 21

• Outlaw Motorcycle Gangs . . . . . . . . . . . . . . . . 22

   • Membership and Recruitment . . . . . . . . . . 23

   • Criminal Activity . . . . . . . . . . . . . . . . . . . . . . 24

   • Trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

• Gangs and the Southwest Border . . . . . . . . . . 28

• Gangs and Extremist Groups. . . . . . . . . . . . . . 31

   • Black Separatist Extremists . . . . . . . . . . . . . 31

   • White Supremacist Extremists . . . . . . . . . . 31

   • Anti-Government Indoctrination . . . . . . . 31

• Gangs in the Military and
   Government Institutions . . . . . . . . . . . . . . . . . 33

• Gang Involvement in Sex
   Trafficking and Prostitution . . . . . . . . . . . . . 36

• Gangs and Technology . . . . . . . . . . . . . . . . . . 39

   • Recruitment . . . . . . . . . . . . . . . . . . . . . . . . . 39

   • Communication. . . . . . . . . . . . . . . . . . . . . . 40

   • Targeting Rivals . . . . . . . . . . . . . . . . . . . . . . 42

   • Criminal Activity . . . . . . . . . . . . . . . . . . . . . . 44

   • Thwart Law Enforcement . . . . . . . . . . . . . . 44

• Law Enforcement Actions and Resources. . . 45

• Outlook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

• Acknowledgements . . . . . . . . . . . . . . . . . . . . . 50

• Appendices . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

   • A. Map of Respondents. . . . . . . . . . . . . . . . 58

   • B. Map of Safe Streets Task
      Force Regions . . . . . . . . . . . . . . . . . . . . . . 60

• Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

# (U) Preface

(U) The National Gang Intelligence Center (NGIC) prepared the 2015 NGR to examine the threat violent gangs pose to the United States. A gang is defined by the US Department of Justice as:

(1) an association of three or more individuals; (2) whose members collectively identify themselves by adopting a group identity, which they use to create an atmosphere of fear or intimidation frequently by employing one or more of the following: a common name, slogan, identifying sign, symbol, tattoo or other physical marking, style or color of clothing, hairstyle, hand sign or graffiti; (3) the association's purpose, in part, is to engage in criminal activity and the association uses violence or intimidation to further its criminal objectives; (4) its members engage in criminal activity, or acts of juvenile delinquency that if committed by an adult would be crimes; (5) with the intent to enhance or preserve the association's power, reputation, or economic resources; (6) the association may also possess some of the following characteristics: (a) the members employ rules for joining and operating within the association; (b) the members meet on a recurring basis; (c) the association provides physical protection of its members from other criminals and gangs; (d) the association seeks to exercise control over a particular location or region, or it may simply defend its perceived interests against rivals; or (e) the association has an identifiable structure; (7) this definition is not intended to include traditional organized crime groups, such as La Cosa Nostra, groups that fall within the Department's definition of "international organized crime," drug trafficking organizations or terrorist organizations.

(U) This report centers on the analysis of gang trends that threaten national security, public safety, economic interests, and law enforcement operations. The 2015 NGR is not an extension of the 2013 or 2011 installments. Rather, it is an independent overview of data obtained between 2013 and 2015. The 2015 NGR ensures compliance with Public Law 109-162, Title XI, Section 1107 (c) and supports US Department of Justice Goal 2.1 (combat the threat, incidence, and prevalence of violent crime) set forth in the US Department of Justice Strategic Plan for Fiscal Years 2014 – 2018.

# (U) SCOPE AND METHODOLOGY

(U) The purpose of the 2015 NGR is to provide a national overview of the current gang threat in the United States by collecting, analyzing, and synthesizing data obtained from law enforcement agencies across the nation. The assessments contained herein were derived from data provided by law enforcement through the *2014 FBI Safe Streets and Gang Task Force Survey*, the NAGIA *2015 National Gang Report Survey*, law enforcement reporting, and open source information.

(U) One hundred and nine respondents completed the *2014 FBI Safe Streets and Gang Task Force Survey* to create a representative sample of the five Safe Streets and Gang Task Force geographic regions. Combining data from the Safe Streets and Gang Task Forces allowed the NGIC to incorporate data from our partner agencies who participate on task forces, but did not complete the NAGIA *2015 National Gang Report Survey*. Thus, data from the *2014 FBI Safe Streets and Gang Task Force Survey* was combined with 569 responses from the four components of the NAGIA *2015 National Gang Report Survey*, law enforcement reporting, and open source information to develop a holistic picture of current gang activity across the country.

(U) The NAGIA *2015 National Gang Report Survey* consisted of four components: a street gang survey; a prison gang survey; an outlaw motorcycle gang (OMG) survey; and a survey on gang activity related to US borders. The street gang survey was distributed to US gang investigators at every level across jurisdictions nationwide, while the prison gang survey was released to jails, prisons, and detention centers. The OMG survey was sent to members of the International Outlaw Motorcycle Gang Investigator's Association. A fourth survey was primarily distributed to gang investigators along the southwest border to collect data on gang activity related to US borders. Using the four-component methodology enabled the NGIC to collect more robust data on each specific topic. Dividing the survey into four parts allowed for the inclusion of more questions on each topic and facilitated completion by gang investigators working each specific topic. With this methodology, respondents were able to focus on their area of expertise. By contrast, the 2013 NGR relied on data from only one general survey that was disseminated to all gang investigators across all jurisdictions.

(U) Due to the utilization of a new survey methodology – using four targeted surveys as opposed to one universal survey – the 2015 NGR does not compare to either the 2013 NGR or the 2011 National Gang Threat Assessment. All longitudinal assessments herein are based entirely on data from the 2015 survey. One drawback to the 2015 methodology was crossover reporting that resulted in a higher margin of error when compiling such quantitative data as numbers and percentages. Due to this crossover, plus the voluntary nature of the survey, results herein lack representation from every jurisdiction. Thus, the NGIC recommends contacting state and local law enforcement agencies directly for more information on gang activity or gang membership numbers in a specific jurisdiction.

UNCLASSIFIED

# (U) NATIONAL GANG INTELLIGENCE CENTER



(U) The NGIC was established by Congress in 2005 in order to support law enforcement agencies through timely and accurate information sharing and to provide strategic and tactical analysis to federal, state, and local law enforcement. A multi-agency fusion center, the NGIC integrates its resources to investigate and study the growth, migration, and criminal networks of gangs that pose a significant threat to communities throughout the United States. The NGIC is comprised of representatives from the Federal Bureau of Investigation (FBI); US Drug Enforcement Administration (DEA); US Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); Federal Bureau of Prisons (BOP); United States Marshals Service (USMS); US Department of Defense (DOD); and US Customs and Border Protection (CBP).

(U) A key function of the NGIC is to educate the law enforcement community on all matters relevant to gangs. In its mission to educate law enforcement, NGIC analysts use their subject matter expertise to train state, local, federal, and international gang investigators. The NGIC further educates law enforcement by integrating its resources to create and disseminate intelligence products that ultimately widen awareness and promote officer safety.

(U) One of the NGIC's primary resources is NGIC Online. A web-based information system, NGIC Online supplies state, local, federal, and international law enforcement partners with an array of tools designed to facilitate research on gang-related intelligence. NGIC Online is available through the Law Enforcement Enterprise Portal (LEEP). To access NGIC Online, law enforcement officers must first authenticate their credentials through the LEEP website, **www.cjis.gov**. Users can then connect directly to NGIC Online and employ its resources to obtain intelligence on a stream of matters relevant to gang populations and activities across the nation. A digital warehouse of data, NGIC Online contains a Gang Encyclopedia; Signs, Symbols, and Tattoos Database; Gang Terms Dictionary; Intelligence Library; and a Gang Training and Events Calendar, all of which are fully searchable and provide users with a vast collection of intelligence products; images; announcements; officer safety alerts; and other materials aimed to promote gang awareness and to assist gang investigations at state, local, and federal levels. NGIC Online also features two communication platforms – a Discussion Board and a Request for Information portal – that allow users to solicit analytical assistance from the NGIC and to communicate with the NGIC's network of gang subject matter experts. The NGIC encourages NGIC Online users to post announcements, share comments and suggestions, and contribute intelligence.

(U) For further information, the NGIC may be contacted via email at **ngic@leo.gov** or by telephone at **1-800-366-9501**.

UNCLASSIFIED

# (U) National Alliance of Gang Investigators' Associations



(U) The National Alliance of Gang Investigators' Associations (NAGIA) is a cooperative organization formed in 1998. With more than 20,000 members representing 23 state and regional gang investigator associations across the country, the NAGIA integrates the expertise of gang investigators nationwide, and combines multiple resources to combat the threat gangs pose to national security.

(U) The NAGIA works to ensure public safety and to fulfill the national need for a coordinated response to violence, drugs, and other gang-related crimes that adversely impact the quality of life within our communities. A unique alliance of criminal justice professionals, the NAGIA dedicates its efforts to the promotion and coordination of anti-gang strategies and provides leadership in the development and recommendation of programs designed to control gang crime.

(U) As part of its function, the NAGIA consolidates and distributes intelligence; advocates standardized training; provides professional training; establishes uniform gang definitions; advises policymakers; maintains partnerships with federal, state, and local law enforcement; aids communities with emergent gang problems; assists criminal justice professionals and public figures in identifying gang members, tracking gangs, and battling gang crime worldwide.

(U) The NAGIA does not serve to replace or duplicate services provided by other entities, but rather drives federal, state, and local anti-gang initiatives and provides support to regional gang investigator associations and the Regional Information Sharing Systems (RISS) Program.

# (U) Executive Summary

(U) Results of the 2015 NGR indicate that gangs of all types remain steadfast in their objectives to generate revenue and gain control of the territories they inhabit; and in their dedication to these objectives, gangs continue to grow in numbers and expand in their criminal activities. As the 2015 NGR reveals, progressions in membership and criminality stem from how fluidly gangs adapt to shifting circumstances so as to protect their interests; ultimately, gangs evolve by consistently adjusting their behaviors to meet their inflexible goals. Gangs thereby emerge as ever-changing, unpredictable organizations that vary from one jurisdiction to the next and thus continue to threaten communities nationwide.

(U) The 2015 NGR examines gangs by categories of street gangs, prison gangs, and OMGs. Intelligence herein explores how all three gang types pursue the same objectives – and commit the same crimes in those pursuits – yet diverge in how they operate. As this report demonstrates, the divergence is due to the fact that each gang is a product of its environment with its own rules of conduct and methods of operation; thus, street gangs differ from prison gangs, while prison and street gangs both differ from OMGs. Understanding the specific mentality of each gang type is integral to disruption and dismantlement. For that reason, the 2015 NGR designates separate sections for street gangs, prison gangs, and OMGs. Each section details the basic characteristics, functions, and partnerships of each gang type and thereby illustrates how each gang type poses a unique threat to the nation.

(U) The 2015 NGR focuses on gang trends from a national standpoint and explains how all gang types partake in criminal endeavors that serve to spread their ideology, widen their networks, produce illicit funds, and secure power. Findings herein reveal that gangs continue to engage in a range of activities in order to meet one or all of these ends. To meet their primary objective – to make money – gangs are increasing their involvement in the high-profit crimes of sex trafficking and prostitution. As a means of securing power, gangs continue to seek employment within the military and within government institutions and law enforcement agencies. Gangs also continue to form partnerships with other criminal organizations in order to widen their networks; thus, gangs have connected with Mexican Transnational Criminal Organizations (MTCOs), sex trafficking rings, and extremist groups. Gangs are also increasing their use of technology – social media in particular – in order to spread their message and recruit new members. Every criminal avenue gangs pursue perpetuates the cycle of securing power, which translates to money, and vice versa.

# (U) Key Findings

(U) Based on survey analysis and reporting from federal, state, local, and tribal law enforcement over the past two years, the NGIC provides the following assessments:

- (U) Approximately half of respondents report street gang membership and gang-related crime increased in their jurisdictions. The most prevalent crimes street gangs commit are street-level drug trafficking, large-scale drug trafficking, assault, threats and intimidation, and robbery. Street gangs exhibit few indicators of decreasing membership or criminal activity. Neighborhood-based gangs remain the most significant threat, while national-level street gangs have a moderate-to-high impact in approximately half of reporting jurisdictions.

- (U) Approximately one-third of jurisdictions report an increase in threats to law enforcement. The attacks that were carried out against law enforcement and judicial officials over the past two years were violent and brazen. However, the number of actual attacks against law enforcement remained relatively stable.

- (U) Over 68 percent of survey respondents indicate prison gang membership has increased over the past two years. The greatest threat of prison gangs lies in their nexus to street gangs and in their ability to corrupt prison officials. Corruption of prison staff threatens various prison systems by facilitating the smuggling practices of inmates. Respondents rate drugs, cell phones, and weapons as the contraband prison gangs most commonly smuggle. Prison gangs engage in a host of other crimes to further their criminal objectives. The most commonly reported crimes include smuggling of contraband, assault, racketeering, extortion, murder, robbery, witness intimidation, and prostitution. Prison gangs also exploit Freedom of Religion rights and rely on female counterparts to facilitate gang activity.

- (U) Larger OMGs have established new chapters and have attracted many new members. The surge in membership has incited clashes for geographic dominance, which has created higher levels of violence. OMGs continue to engage in all types of violent crimes to include: weapons possession, threats and intimidation, assault, arson, extortion, and drug trafficking. OMGs have a notorious reputation for their use of violence and often employ brute force to exact punishment on rival gangs and on their own members. OMGs mainly recruit motorcycle enthusiasts and members of the US biker community. Some larger OMGs require smaller motorcycle gangs or sport bike clubs to wear a support patch and demand monthly payments in exchange for the patch. OMGs rely on support clubs for recruitment purposes, financial support, and to counter rival gangs.

- (U) Gangs continue to foster partnerships with MTCOs. Survey respondents identified more than 96 gangs involved in cross-border crimes. Sureños, Barrio Azteca, and Tango Blast rank as the top three most criminally active gangs along the US/Mexico

Border, while the Sinaloa Cartel emerges as the MTCO with the most gang ties. Despite intelligence to support gang/MTCO partnerships, the exact nature of these relationships remains unclear. Drug trafficking is the cross-border crime gangs most frequently commit.

• (U) Approximately 26 percent of jurisdictions and 44 percent of prison facilities report that gang members joined domestic extremist groups. A mutually beneficial arrangement, extremists use gangs to spread their doctrine, while gangs turn to extremists to increase membership and facilitate collaboration with other criminal organizations. Gangs also refer to extremist ideology to respond to perceived injustices and to enact social change.

• (U) Survey respondents indicate that over the past two years known or suspected gang members from over 100 jurisdictions have applied for positions or gained employment with the US military, law enforcement agencies, corrections facilities, and within the judiciary. Employment with the US military ranked as the most common, followed by corrections, law enforcement, and the judiciary.

• (U) Approximately 15 percent of respondents report that gangs in their jurisdiction engage in human trafficking. According to law enforcement reporting, gang involvement in sex trafficking has increased over the past two years. This is likely a significant underestimation, as sex trafficking is often underreported for two reasons: victims fail to report due to shame or fear; and misclassification of gang-involved cases, where the offense is cited as prostitution, as opposed to sex trafficking. Gangs that partake in sex trafficking and prostitution crimes typically collaborate with other criminal organizations in order to maximize profit and evade detection from law enforcement.

• (U) Social media and other forms of technology play an essential role in the illicit activities of gang members. Gangs use a number of sites, applications, and platforms to recruit prospects, facilitate communication, target rivals, and to thwart law enforcement efforts. Over the past two years, gang members' utilization of technology, social media in particular, has risen significantly, enabling gangs to more readily further their criminal objectives. Nearly all jurisdictions report gang member use of technology, most frequently citing Facebook, YouTube, Instagram, and Twitter. Technology is also playing an increasingly pivotal role in police investigations and anti-gang efforts. Over 54 percent of agencies report integrating social media into their gang investigations within the past two years.

UNCLASSIFIED

# (U) STREET GANGS

*(U) Definition: Street gangs are criminal organizations that formed on the street and operate in neighborhoods throughout the United States. Neighborhood-based gangs are confined to specific neighborhoods and jurisdictions, with no known leadership beyond their communities. National-level gangs have a presence in multiple jurisdictions.*

(U) Neighborhood-based gangs and national-level street gangs vary in membership, racial composition, and structure, but are present throughout the United States and continue to pose a significant threat. Neighborhood-based gangs are reported to be the highest threat, perpetuating violence, drug distribution, and opportunistic crimes, such as robbery, in communities throughout the country.[1] National-level street gangs have a high or moderate impact in approximately half of jurisdictions.[2]

## (U) MEMBERSHIP

(U) Street gangs continue to impact communities across the United States and do not show signs of decreasing membership nor declining criminal activity.[a]

- (U) According to survey respondents, street gang membership increased in approximately 49 percent of jurisdictions over the past two years, stayed the same in 43 percent, and decreased in about eight percent of jurisdictions.[3]

- (U) Half of survey respondents indicate gang-related crime in their jurisdiction increased over the past two years, while an additional 36 percent indicate crime rates stayed the same.[4] Gang-related criminal activity decreased in fewer than 14 percent of jurisdictions.



UNCLASSIFIED

**Street Gang Membership Change Over the Past Two Years**

Increased
Stayed the same
Decreased

UNCLASSIFIED

(U) Source: NAGIA Survey Data.



UNCLASSIFIED

**Gang-Related Activity Over the Past Two Years**

Increased significantly
Increased slightly
Stayed the same
Decreased slightly
Decreased significantly

UNCLASSIFIED

(U) Source: NAGIA Survey Data.

---

[a] (U) For detailed information on membership numbers, the NGIC recommends contacting state and local law enforcement agencies directly.

UNCLASSIFIED

## (U) CRIMINAL ACTIVITY

(U) Street gang activity continues to be oriented toward violent crimes, such as assault, drug trafficking, home invasions, homicide, intimidation, threats, weapons trafficking, and sex trafficking. Respondents report the most prevalent gang-related criminal activities are street-level drug trafficking, assault, threats and intimidation, robbery, and large-scale drug trafficking.[5] Below are illustrative examples of these crimes occurring throughout the country.

### (U) DRUG DISTRIBUTION

- (U) According to *2014 FBI Safe Streets and Gang Task Force Survey* respondents, the top reported drugs by region are as follows: West: methamphetamine; North Central: cocaine; Northeast: heroin; South Central: cocaine; Southeast: heroin.[6]

- (U) As of August 2014, Taliban and Young N' Thuggin gang members distributed crack cocaine, powder cocaine, marijuana, liquid codeine and prescription drugs in Minnesota and North Dakota.[7]

- (U) Open source reporting indicates the Hoover Crips trafficked approximately $10 million of cocaine and marijuana obtained from MTCOs through Dallas, Texas; Oklahoma City, Oklahoma; and Tulsa, Oklahoma, before going through Ohio to the northeastern United States.[8]

### (U) INTIMIDATION/THREATS

- (U) According to open source information, 12 suspected United Blood Nation (UBN) members were charged in the October 2014 murders of a Charlotte, North Carolina, couple in order to prevent the husband from testifying against UBN members who tried to rob their mattress store.[9]

### (U) FINANCIAL CRIMES

(U) Survey results indicate that – although to a lesser extent than violent crime – street gangs continue to engage in financial crimes, such as identity theft, credit card fraud, prescription drug fraud, counterfeiting, check fraud, fencing stolen goods, money laundering, mortgage fraud, social security fraud, and tax fraud. Over the last few years, street gangs have become more involved in white-collar crimes due to weaker sentencing guidelines and the ease of making money.

## (U) ALLIANCES AND RIVALRIES

(U) Gangs are flexible organizations that form alliances and rivalries based on race, geography, protection, resources, and control. These alliances and rivalries are formed to attain as much money and power as possible. Ultimately, a gang will feud with any organization that interferes with its objectives and will align with any organization that will advance its objectives.

(U) Collaboration among street gangs has increased, with approximately 43 percent of jurisdictions reporting that rival gangs formed alliances over the past two years.[10] Multiple jurisdictions report gangs in their jurisdiction merged or formed hybrid gangs to thwart law enforcement efforts through their use of unknown names and symbols. However, the most common reason survey respondents cite for these alliances is mutual benefit, particularly to maximize profits from drug activities.[11]

- (U) In San Diego, California, the Black MOB, Skanless, Neighborhood Crips, Lincoln Park,

and West Coast Crips gangs worked together to traffic females in 46 cities across 23 states.[12]

(U) Despite increased collaboration for mutual profit, street gangs continue to feud and form rivalries. These conflicts often arise over drugs, money, and territory.

## (U) TRENDS

### (U) THREATS TO LAW ENFORCEMENT

(U) While the relationship between law enforcement and gangs has always been tumultuous and threats of harm from numerous gangs have been documented against law enforcement, recent reporting indicates that gangs are becoming bolder in both their threats and actions toward law enforcement. Approximately one-third of jurisdictions report an increase in threats to law enforcement. The attacks that were carried out against law enforcement and judicial officials were violent and brazen. However, the actual number of attacks against law enforcement has remained relatively stable.

- (U) On 24 May 2014, a police officer of the Salt River Pima-Maricopa Indian Community in Arizona was murdered by members of the East Side Los Guada Bloods in response to a racketeering case against the gang. Furthermore, the East Valley Gang and Criminal Information Fusion Center indicated that leaders of the Warrior Society gang encouraged members to target law enforcement officers, specifically officers from tribal agencies.[13]

- (U) On 5 April 2014, the father of a Wake County, North Carolina, Assistant District Attorney (ADA) was kidnapped by known UBN gang members under the direction

of the incarcerated godfather of the 183 Blood set. The original plot was to kidnap and murder the ADA in retaliation for prosecuting the leader. The ADA's father was rescued.[14]

(U) Threats against law enforcement are delivered in numerous ways: in person; through social media; via text messages, phone calls, and e-mail; by items left at an officer's home or office; and through graffiti. Of these methods, threats through social media are most often utilized, followed by in-person threats, and graffiti.[15]

- (U) In early 2014, a Detroit, Michigan, gang member used social media to openly threaten the Detroit Police Chief.[16]

- (U) In December 2014, MS-13 members communicated a threat to Arkansas law enforcement by placing graffiti on the wall of a gas station in Rogers, Arkansas.[17]



(U) Source: KFSM.
(U) MS-13 graffiti threatening law enforcement.



(U) The survey question asked respondents to indicate the level of street gang involvement in various criminal activities. The choices were High, Moderate, Low, Unknown, and None. The graphic depicts the percent of jurisdictions reporting High, Moderate, and Low gang involvement for each criminal activity.

UNCLASSIFIED

# (U) PRISON GANGS

*(U) Definition: A prison gang is a criminal organization that originates in the penal system and continues to operate within correctional facilities throughout the United States. Prison gangs are self-perpetuating criminal entities that also continue their operations outside of prison.*

(U) Much of the threat of prison gangs stems from their nexus to street gangs. Though not visible to the outside world, prison gangs impact communities nationwide through their control over their street subordinates. Street gang members commit crimes at the behest of incarcerated members and then forward revenue and contraband gained from the commission of their crimes into prison. In exchange, incarcerated gang members provide protection to the street gang members when they are incarcerated.

## (U) MEMBERSHIP

(U) Prison gangs most often form along racial or ethnic lines.[18] This can be observed in state and federal facilities across the country.

- (U) According to survey findings, Bloods, Crips, Sureños, Almighty Latin King and Queen Nation, and Gangster Disciples rank as the five most commonly reported gangs within state facilities.[19]

(U) Survey results show that prison gang membership has increased steadily in correctional systems at federal, state, and local levels.[20] Prison gang numbers fluctuate from

one institution to another and from one system to another due to inmate transfers, inmate releases, and the introduction of existing gang members to the population.

- (U) Overall, 68 percent of survey respondents indicate prison gang membership has increased in the past two years.[21]

- (U) Individually, 75 percent of BOP survey participants, 79 percent of state participants, and 100 percent of local participants marked a notable increase in membership.[22]



UNCLASSIFIED
**Prison Gang Membership Changes Over the Past Two Years**

- Increased
- Stayed the same
- Decreased

UNCLASSIFIED

(U) Source: NAGIA Survey Data.

# (U) STRUCTURE

(U) Many street and prison gangs organize into a single structure that divides into two primary categories: leadership and soldiers. Leadership roles of incarcerated members extend from prison activities to street operations.

- (U) In Hispanic gang culture, particularly in California, prison gangs strictly oversee street gangs. The two lead Hispanic prison gangs in California – the Mexican Mafia and the Nuestra Familia – and their respective subordinates – Sureños[b] and Norteños – maintain structures wherein incarcerated members direct their street partners. In the Mexican Mafia/Sureño infrastructure, leadership falls exclusively to the Mexican Mafia, which is comprised almost entirely of inmates with life sentences. Hispanic gang structure is a parent/subordinate arrangement, whereby Mexican Mafia and Nuestra Familia leaders appoint shot callers to direct Sureño and Norteño street activity. Appointed Sureño and Norteño shot callers enforce orders from their prison leaders and thereby act as conduits between the street and prison.

(U) The dynamic between street and prison gangs is usually one of prison leadership and street subordination. However, some intelligence reveals reversals of power and opposite methods of operations in street/prison arrangements. While the power structure in these instances is not one of prison leadership and street subordination, prison gang involvement still contributes to criminal activities outside correctional facilities and can elevate the threat to communities.

# (U) CRIMINAL ACTIVITY

(U) Prison gangs commit a wide spectrum of crimes, from minor transgressions to acts of extreme violence that claim multiple victims. Not every prison gang commits every type of crime, as gangs vary by sophistication, size, and other factors that influence criminal potential. However, prison gangs will engage in any illicit activity that will further their objectives to generate money, control territory, and secure power.

---

[b] (U) The Mexican Mafia and Sureños are distinct yet interdependent organizations that function in a parent/subordinate capacity. The Mexican Mafia issues orders to Sureños that in turn serve as foot soldiers for the Mexican Mafia. Sureño gangs, to include MS-13, do not hold membership in the Mexican Mafia and can be categorized into their own distinct gangs.

UNCLASSIFIED

## (U) Prison Gangs v. Street Gangs

(U) Prison gangs typically consist of a select group of inmates that maintain an organized hierarchy and an established code of conduct. Prison gangs vary in organization – from tightly structured hierarchies – to loosely assembled conglomerations. A prison gang employs rules for joining and operating within its association; meets on a regular basis; provides physical protection to its members; seeks territorial control; defends its interests; and sustains an identifiable structure.

(U) Gang culture in prison parallels that on the streets. Much like street gang practice, prison gang members function under the mentality of unification and adherence to a single ideology. As with street gangs, prison gangs unite under the banner of one name and identify with one set of signs and symbols. The names of most prison gangs are synonymous with their symbols and they use the two interchangeably in their artwork, tattoos, and other forms of communication.

(U) Prison gang objectives mirror street gang priorities to gain as much influence and generate as much money as possible. The basic purpose of a prison gang is to engage in criminal activity and use violence and intimidation to further its power, reputation, and resources.

(U) Prison gangs are typically more structured and disciplined than street gangs because they do not have the same mobility; incarcerated members cannot escape their environment and are thereby forced to comply with the regulations of their gangs. Membership is for life in most prison gangs; dropping out is punishable by death, which is easy to enforce given its membership is confined to a shared space.

(U) The threat of prison gangs lies largely in their control over street gangs and in their ties to MTCOs. Prison gangs order gang members on the street to conduct crimes on their behalf and thereby function as brokers in the transfer of drugs from MTCOs to street gangs. Both activities render prison gangs proximally responsible for many of the drug crimes that occur in the United States.

(U) Many prison gangs operate almost entirely by reputation and are not visible to the street gang members they control. Likewise, they are not immediately discernible to law enforcement and are hidden from the general public. Thus, the threat of prison gangs is often overlooked, which ultimately allows them to escape law enforcement scrutiny and remain untargeted in gang investigations. Due to their grip on street gangs, prison gangs are able to remain anonymous in their crimes and in their effect on national crime rates. The symbiotic relationship between street and prison gangs makes prison gangs a matter of national concern, as street gangs commit crimes and impact communities across the country on behalf of prison gangs.

UNCLASSIFIED

## (U) SMUGGLING

(U) Prison gangs across the nation partake in smuggling activities. The contraband most commonly reported – drugs, weapons, and cell phones – all facilitate gang objectives to increase power, control territory, and produce revenue. Drugs translate to money; weapons generate power; and cell phones enable inmates to readily direct gang members in the territories under their command.

- (U) Weapons are the second most reported contraband, with homemade weapons being of greatest concern.[24]

- (U) Cell phones are the third most common contraband, ranking almost equally with weapons.[25]



(U) Source: NAGIA Survey Data.



(U) Source: BOP.
(U) Cigarettes smuggled into a prison.

- (U) Drugs are the most common contraband reported inside prisons, accounting for almost half of total contraband. Marijuana and synthetic cannabinoids[c] are equally reported, followed by Suboxone, heroin, and methamphetamine.[23]

- (U) Tobacco, alcohol, food, gang-related paraphernalia, and other items comprise the rest of the contraband in survey reports.[26]

- (U) State facilities report collusion with prison staff is the primary method gangs use to smuggle cell phones.[27] Smuggling occurs through corrupt staff, visitors, and legal mail, such as packages and letters.  In some

---

[c] (U) Synthetic cannabinoids, often referred to as "K2" or "spice", refers to a wide variety of drugs manufactured in laboratories to mimic the effects of controlled substances. When one synthetic cannabinoid becomes scheduled, chemists alter the chemical formula to produce a new substance that is not yet scheduled. Distributors label these drugs as "not for human consumption" in an attempt to avoid enforcement action. They are typically sprayed onto shredded plant material and then smoked.



(U) Source: BOP.
(U) Suboxone hidden in a magazine sent to an inmate.



(U) Source: BOP.
(U) Drugs smuggled into a prison.

cases, contraband is thrown over fences onto prison yards. The high occurrence of cell phone smuggling is due to the fact that communication is paramount to the control prison gangs maintain over street gangs.

## (U) DRUGS

(U) State and federal facilities reported drug trafficking among the top crimes prison gangs commit. Accordingly, drugs provide the number one source of revenue for street and prison gangs and thus the two entities work jointly to secure illicit funds through drug-related crimes and to establish influence in the drug trade.

(U) Prison gangs do not gravitate toward a specific drug type. Drug involvement only requires accessibility. The drugs most readily available in a specific region also rank among the highest reported. Since their ultimate objective is to make money, gangs will attempt to capitalize on any drug within reach. For that

reason, law enforcement reporting links gangs to all drug types.[28]

- (U) According to survey responses from state correction entities, gangs are connected to the following drugs: marijuana, cocaine, crystal methamphetamine, Suboxone, heroin, and synthetic cannabinoids.[29]

## (U) TRENDS

### (U) CORRUPTION OF PRISON STAFF

(U) Corruption of prison staff continues to threaten the US penal system. Many prison gangs target corrections officers specifically to facilitate their interactions with street gangs and to sustain their criminal operations. Studies implicate officers in transgressions, such as smuggling contraband, laundering money, providing sexual favors to gang members, engaging in prostitution activities, issuing orders to street gangs, and assisting communication efforts between prison and

street members.[30] Most often, compromised prison staff smuggle such contraband as drugs, cigarettes, and cell phones for gang members. These items rank high in smuggling efforts of corrupt staff, as drugs and cigarettes constitute the backbone of the black-market economy run by gangs and cell phones allow prisoners to communicate within institutions, between prisons, and with their street counterparts.[31]

- (U) Approximately two-thirds of survey respondents report that staff members aid inmates in smuggling cell phones into facilities.[32]

- (U) According to open source reporting, two prison sergeants of the Florida Department of Corrections allegedly ordered an inmate to be killed to protect their involvement in an institution-wide gang operation. By account of court records, for more than a year, at least five guards, including the two sergeants in question, smuggled drugs, cigarettes, and cell phones for Bloods and Folk Nation gangs in exchange for thousands of dollars in payment.[33]

- (U) The Maryland Department of Public Safety and Correctional Services uncovered a ring of corrupt prison staff in collusion with the Black Guerilla Family. As of March 2015, 24 correctional officers were convicted for their role in the racketeering conspiracy, which included helping the Black Guerilla Family smuggle cell phones, prescription pills, and other contraband into a city jail by means of their hair, shoes, and underwear.[34]



UNCLASSIFIED
(U) Source: Pixabay.com.

UNCLASSIFIED

- (U) Open source reporting indicates that since 2010, the Mississippi Department of Corrections has referred 63 cases for prosecution of officers involved in smuggling contraband into prison. Accordingly, a former corrections officer claims some corrupt officers make thousands of dollars for smuggling contraband. A former gang leader agrees, stating that many officers find it difficult to resist the "easy" money. Reports reveal corrupt officers also provided favors, such as allowing gang members in lockdown to move into another area to injure a fellow inmate.[35]

## (U) MEASURES OF OPEN CONCEALMENT

(U) Prison gangs will resort to any means possible to further their objectives. One method gangs use to advance their cause is to exploit their First Amendment rights so they may conduct gang activity openly without detection. In some cases, gang members infiltrate religious groups to conduct meetings, move and hide contraband, or obtain prohibited material.

## (U) FEMALE PRISON REPRESENTATION

(U) Female involvement in prison gangs most often occurs in the form of outside facilitation, presenting females as active yet subsidiary participants that aid and abet crimes led by their male counterparts. Prison gangs rely on female facilitation to further criminal objectives – and in some cases to merely exist – as many prison gangs could not survive without their female partners.[36]

UNCLASSIFIED

# (U) Outlaw Motorcycle Gangs

*(U) Definition:* OMGs are ongoing organizations, associations or groups of three or more persons with a common interest or activity characterized by the commission of, or involvement in, a pattern of criminal conduct. Members must possess and be able to operate a motorcycle to achieve and maintain membership within the group.

## (U) Characteristics of Outlaw Motorcycle Gangs

(U) The Hells Angels Motorcycle Club, Pagans, Vagos, Sons of Silence, Outlaws, Bandidos, and Mongols are the largest OMGs. All are classified as "one percent" (1%) clubs. The term 1% originated when the American Motorcycle Association released a statement in response to a riot that occurred on 4 July 1947 at the Dirt Hill Climb motorcycle races in Hollister, California. The American Motorcycle Association spokesperson stated that 99 percent of the motorcycling public was comprised of honest, law-abiding citizens, and that only one percent constituted troublemakers. OMGs took pride in the reference and adopted 1% as its symbol. Not all OMG members boast the symbol; however, OMGs profess to be one percenters or the one percent of bikers who have rejected societal norms and dedicated their lives to their club.

(U) Motorcycle gangs have evolved over the past 67 years from bar room brawlers to sophisticated criminals. OMGs, which were formed in the United States, over the last 50 years have spread internationally and today they are a global phenomenon. The Hells Angels in particular stands out for its international connectivity. Survey respondents identify Hells Angels members, more than any other OMG, as having the most international travel within the last two years.

(U) Ownership of motorcycles has created a growth industry that accommodates thousands of legitimate recreational riders throughout North America. Increasing societal acceptance of motorcycle riders has provided OMGs a way to camouflage their gangs' nefarious criminal activities. The larger, more sophisticated OMGs, such as the Hells Angels, Iron Horsemen, Outlaws, Bandidos, Mongols, Pagans, Sons of Silence, and the Vagos have adopted the public posture of claiming they are just motorcycle riders who belong to a club. The other part of the subterfuge lies with their claim that the criminal activities of individual members are not directed by the gang. Other gangs claim their violent reputation is due to criminal activities in their past.

## (U) Membership and Recruitment

(U) OMGs recruit mainly from fellow motorcycle enthusiasts and from the US biker community at large. Larger OMGs often have proxy gangs or support clubs, which according to survey results, account for the vast majority of OMG recruits. Some larger OMGs require smaller motorcycle gangs or sport bike clubs to wear support patches. These OMGs demand monthly payments from each motorcycle club or sport bike club member in exchange for their use of support patches. Refusal to wear a support patch results in violence. Accordingly, membership in an OMG is an extremely violent existence marked by frequent assaults by rival gangs and intra-gang aggression.

- (U) OMGs sell support gear to their associates to fundraise for their clubs and to demonstrate the dominance, control, and support the OMG has in that geographic


(U) Source: ATF via the Columbus, Ohio, Police Department.
(U) Phantom Motorcycle Club flag demonstrating connections to the Vice Lords street gang through the inclusion of the top hat and cane emblem.

area. Wearing support gear of one gang into the territory of a rival is seen as an act of disrespect that has resulted in violent confrontations.

(U) Reporting indicates street gangs, prison gangs, and extremist groups serve as significant recruiting pools for OMGs, with approximately equal recruitment from each category. Black OMGs are known to recruit members from street gangs.

- (U) According to a US Department of Justice press release, six leaders and members of the Phantom Motorcycle Club and Vice Lords street gang were convicted of conspiracy to commit murder and other racketeering offenses, as of March 2015. The Phantom Motorcycle Club National President, National Enforcer, and four other members were found guilty.[37]


(U) Source: ATF.
(U) Wheels of Soul support patch.

(U) The largest black motorcycle gangs—Chosen Few, Hell's Lovers, Outcasts, Sin City Deciples, Thunderguards, and Wheels of Soul—have a male only membership. Although primarily African American, the Chosen Few, Hell's Lovers, Sin City Deciples, Thunderguards, and Wheels of Soul have some non-African American members. Black motorcycle gang violence has historically involved assaults and homicides, which have been directed against smaller motorcycle group members. There does not appear to be a formal alliance among the Black Outlaw Motorcycle Clubs as each gang has had violent encounters. However, some Black Outlaw Motorcycle Clubs have formed informal alliances when advantageous in their geographic region.

- (U) On 17 May 2015, several Texas motorcycle clubs arranged to meet at the Twin Peaks restaurant in Waco, Texas, to discuss and possibly resolve ongoing issues between the Cossacks and Bandidos. An altercation occurred between the Bandidos, Cossacks, and their respective support clubs in which nine individuals were killed and numerous others were injured.[38]

- (U) In February 2015, members of the Hells Angels and Red Devils, a support club for the Hells Angels, pleaded guilty to conspiracy to commit a series of violent racketeering crimes, including maiming, assault with a weapon, and assault resulting in serious bodily injury.[39]

## (U) Criminal Activity

(U) The size of an OMG influences its ability to form gang alliances and engage in criminal activities. Over the past two years, larger motorcycle gangs have continued to gain or maintain control of geographic areas and have established new chapters, thereby attracting many new members. This has caused geographic clashes for dominance in overlapping gang-controlled areas. These clashes lead to a cycle of violence in which OMGs seek retribution for actions against the gang or a fellow member. The cycle of violence is often punctuated by periodic truces.



(U) Source: The Associated Press by Jerry Larson.
(U) Twin Peaks restaurant, the site of a violent confrontation between the Cossacks and Bandidos in May 2015.



**(U) OMG Involvement in Criminal Activity**

(U) Source: NAGIA Survey Data.

(U) The survey question asked respondents to indicate the level of OMG involvement in various criminal activities in their jurisdiction. The choices were High, Moderate, Low, Unknown, and None. The graph depicts the number of jurisdictions reporting High, Moderate, and Low OMG involvement for each criminal activity.



(U) Source: ATF
(U) Support patch for Hells Angels, represented by the number 81, and the Red Devils, represented by the number 184.

- (U) In September 2014, several Outcast Motorcycle Club members arrived at the Showstoppers Motorcycle Club clubhouse in Birmingham, Alabama, and opened fire, killing members of the Wheels of Soul and Showstoppers.[40]

(U) OMGs have a well-earned reputation for violence, so witnesses are often reluctant to testify for fear of retaliation. Thus, unless an OMG commits a homicide or an assault that requires hospitalization, OMG violence frequently goes unreported to law enforcement.

- (U) In March 2015, members of the Wheels of Soul and Bandidos engaged in a gunfight at a restaurant in Albuquerque, New Mexico. Although a Wheels of Soul member was shot and sustained non-life-threatening injuries, he was not willing to talk to police about the incident.[41]

- (U) According to open source reporting, in March 2014, two Hells Angels members sought medical treatment for stab wounds sustained during an altercation with Mongols members on a freeway near Temecula, California. The injured Hells Angels members were not willing to cooperate with law enforcement or say who was responsible for their injuries.[42]

(U) OMGs engage primarily in violent crimes, such as assault, robbery, and homicide. According to survey respondents, weapons possession; threats and intimidation; assault; and drug trafficking were the most common criminal activities committed by OMGs over the past two years.[43] The assaults and robberies were often directed at rival gangs or individuals involved in other criminal activities like drug trafficking. Methamphetamine, cocaine, and marijuana ranked respectively as the top three drugs that led to OMG arrests over the past two years.

## (U) TRENDS

(U) Over the past several years, there has been reporting of OMG members retaining employment in various white-collar professions. Accordingly, many OMG members are business owners. Most survey responses report that a preponderance of businesses owned by OMG members involve manual labor, which perpetuates the myth that OMGs are typically blue-collar workers. Based on survey responses, businesses owned by motorcycle gang members predominately involve the service industry, such as motorcycle repair shops and tattoo shops.[44] In some instances, OMGs use their businesses to facilitate criminal activity.



UNCLASSIFIED

# (U) OMG Member-Owned Businesses

- Motorcycle Repair
- Tattoo Parlor
- Automobile Repair
- Bar (Owner/Operator)
- Construction/General Contractor
- Body Guard/Security/Bouncer
- Gentlemen's Club (Strip Club)
- Bail Bondsman
- Trucking/Transportation
- All Others

UNCLASSIFIED

(U) Source: NAGIA Survey Data.

# (U) GANGS AND THE SOUTHWEST BORDER

(U) Cross-border crime remains a significant concern for law enforcement throughout the country, as these crimes directly impact border regions and indirectly impact jurisdictions throughout the country. Drug trafficking that emanates from the US southwest border affects all regions, as gangs fight to defend their drug distribution territory and distribute harmful drugs to communities throughout the United States.

(U) Survey respondents identified more than 96 gangs conducting cross-border crimes.[45] Sureños, Barrio Azteca, and Tango Blast ranked as the top three most criminally active gangs along the US/Mexico border.

(U) According to survey respondents, drug trafficking is the cross-border crime most frequently conducted by gangs.[46] Street-level sales are the most common drug



UNCLASSIFIED

## (U) Top Gangs Involved in Cross-Border Crimes

- Sureños
- Barrio Azteca
- Tango Blast
- Mexican Mafia
- Paisa
- Latin Kings
- MS-13
- Texas Syndicate
- Bloods
- Crips
- Norteños
- Artistas Asesinos

UNCLASSIFIED

(U) Source: NAGIA Survey Data.

UNCLASSIFIED



UNCLASSIFIED

**(U) High Involvement by Gangs in Cross-Border Crimes**

UNCLASSIFIED

(U) Source: NAGIA Survey Data.
(U) The survey question asked respondents to indicate the level of involvement in various criminal activities. The choices were High, Moderate, Low, Unknown, None. The percentages focus on responses indicating High involvement.
"Prostitution," "Alien Smuggling," and "Human Trafficking" are further defined in the Gang Involvement in Sex Trafficking and Prostitution section of this report.

trafficking activity, more so than drug shipment protection or large-scale transportation. Survey respondents indicate that high[d] gang involvement in these aspects of drug trafficking were approximately 73 percent, 41 percent, and 58 percent, respectively.

(U) Gang members utilize a multitude of methods to smuggle drugs into the United States. Respondents identified the following methods: load driver, vehicles with hidden compartments, tractor trailers, commercial vehicles, passenger vehicles, on-foot/back pack, rail (freight or passenger train), internal cavity concealment, body carry, and even the creation of an alliance with a rival gang to coordinate drug transportation. The means by which a gang attempted to traffic drugs into the United States depended on its relationship with its supplier and its objectives.

[d] (U) The survey questions asked respondents to indicate the level of involvement in various criminal activities. The choices were High, Moderate, Low, Unknown, None. The percentages focus on responses indicating High involvement.

UNCLASSIFIED



(U) Source: DEA.

Menace of Destruction, Hermanos de los Pistoleros, and Crips all work with the Sinaloa Cartel.[49] However, only 16 percent of respondents indicate knowledge of prison gang and MTCO collaborations.[50]

(U) Survey respondents across the nation connect their local gangs to MTCOs. However, the vast majority of respondents cannot explain the origins of the connections nor how the organizations interact. [47, 48] On the topic of which gangs maintain relationships with MTCOs, respondents most often cite Barrio Azteca and Sureños. The Sinaloa and Juarez Cartels were most frequently referenced for their ties to gangs. Interestingly, some responses indicate "any available drug trafficking organization" suffices.

- (U) According to data from the *2014 Safe Streets and Gang Task Force Survey*, gangs in all five Safe Streets and Gang Task Force regions are tied to the Sinaloa Cartel.

- (U) Similarly, prison gang survey respondents most commonly pair gangs with the Sinaloa Cartel. According to survey data, Sureños, Mexican Mafia, Norteños, Tango Blast, Bloods, Aryan Brotherhood, Gangster Disciples, Ghost Face Gangsters,

# (U) Gangs and Extremist Groups

(U) Gangs provide fertile grounds for recruitment by extremist groups, including black separatist extremists,[e] white supremacist extremists, and sovereign citizen extremists.[f] Recruiting gang members enables these groups to expand and spread their doctrine. Gangs then use these groups and their teachings for a number of reasons, including the ability to exploit Freedom of Religion rights; to increase membership and collaboration with other criminal organizations; and to respond to perceived injustices by attempting to enact social change, often by engaging in criminal activity.



(U) Source: FBI.
(U) Bumper sticker containing sovereign citizen rhetoric.

(U) Approximately one-quarter of jurisdictions and 44 percent of correctional facilities report gang members in their jurisdiction joined extremist groups.[51] OMG members, for example, continue to establish and maintain relationships with domestic extremist groups.[52] Traditionally all-white OMGs and predominantly African American OMGs were both identified as associating with white supremacist groups and black separatist groups, respectively. Some gang members may also adhere to anti-government ideologies, for example claiming sovereign citizen status to escape criminal charges or indictment.

## (U) Black Separatist Extremists

(U) Over the past two years, gangs have increasingly adopted and incorporated black separatist extremist ideologies, using these teachings to advance the gang, justify criminal activities, or create new organizations.

## (U) White Supremacist Extremists

(U) Driven by their belief in their superiority, white supremacist groups attempt to recruit gang members with similar ideologies. White supremacist groups work with gangs to facilitate illegal activity and to advance their cause.

## (U) Anti-Government Indoctrination

(U) FBI reporting and survey data results reveal some gang members embrace anti-government philosophies and refuse to recognize the authority of the US Government.

---

[e] (U) Black separatist extremists are individuals or groups who seek a separation from the non-black US population wholly or in part through the use of force or violence in violation of federal law.

[f] (U) Sovereign citizen extremists are US citizens who reject their US citizenship and seek to advance their beliefs through force or violence, in violation of federal law.

UNCLASSIFIED

Gang members often learn anti-government tactics while incarcerated. Once released, gang members continue to use the tactics during interactions with law enforcement in attempts to circumvent legal recourse.

UNCLASSIFIED

# (U) GANGS IN THE MILITARY AND GOVERNMENT INSTITUTIONS

(U) Survey respondents indicate that known or suspected gang members from more than 100 jurisdictions applied for positions or gained employment at any level of the US military, law enforcement, corrections, or the judiciary over the past two years.[53]  Of those, the US military was identified as the most common, followed by corrections, law enforcement, and judiciary.

(U) Military-trained gang members pose a serious threat to law enforcement and to the public. They learn combat tactics in the military, then return home to utilize these new skills against rival gangs or law enforcement. Military training of individual gang members could ultimately result in more sophisticated and deadly gangs, as well as deadly assaults on law enforcement officers.



(U) Source: NAGIA Survey Data.

(U) Law enforcement agencies reporting gang members who have applied or gained employment in the military.

UNCLASSIFIED

Additionally, military members' access to weapons and their perceived ability to move easily across the US border may render them ideal targets for recruitment. Survey responses indicate that members of all gang types have been reported to have military connections or training.

- (U) According to a report by the Virginia Department of Corrections, in March 2015, an inmate with gang membership had been corresponding with other members of his gang in an attempt to recruit and evaluate an Army soldier. The active duty soldier knew the inmate through hometown contacts.[54]

- (U) According to open source reporting, in December 2014, an Air Force captain was sentenced to 25 years in prison and dismissed from the service after being found guilty of leading a violent street gang that distributed drugs, provided alcohol to teens, and arranged for the exchange of money for sex with underage girls.[55]

(U) OMGs have strong links to the military.[56] OMGs, such as the Hells Angels, Vagos, and Mongols, have successfully gained access to military installations; recruited several active duty military personnel; and associated regularly with active duty military personnel. ATF and other law enforcement agencies report that OMG members have been employed as federal employees and contractors, active duty military, reservists, and National Guardsmen, which enables expansion.

(U) Gang access to government institutions remains low. However, attempts continue and the potential impact for infiltration is substantial. Infiltration of government institutions can provide gangs with access to sensitive law enforcement information, including law enforcement techniques and pending investigations. Infiltration can further help shield illicit activity and provide access to compromised police officers, which can hamper law enforcement efforts, and ultimately undermine public confidence in law enforcement. Infiltration often involves attempts by gang members, gang associates, and their family members to gain access through civilian positions.

- (U) In December 2014, an officer of the Memphis, Tennessee, Police Department was investigated for her involvement in a local rapper's music video that spoke about gang affiliation and chronicled the officer and a group of women kidnapping another group of women.[57]

UNCLASSIFIED

UNCLASSIFIED

## (U) MCIO Statement

(U) The Military Criminal Investigative Organizations (MCIO) – Air Force Office of Special Investigations (AFOSI), Army Criminal Investigation Command (CID), and Naval Criminal Investigative Service (NCIS) – have identified military personnel with street gang and OMG membership or affiliation in their respective branches of the US Armed Forces; however, their presence does not appear to be widespread or organized. The AFOSI, CID, and NCIS report that less than one percent of felony investigations conducted in fiscal years 2013 and 2014 involved military members who were identified as gang members and their associates.

(U) MCIO participation in this publication helps educate our law enforcement partners about the presence of military members with gang affiliation or membership and encourages reporting to the MCIOs when identification of military members with known or suspected gang membership or affiliation is developed. It also helps formulate a more accurate threat picture as it relates to street gangs and OMGs in the military.

(U) The MCIOs encourage gang officers and detectives to reach out to recruiters from all branches of the military in their jurisdiction. This outreach will facilitate coordination and aid recruiters by providing them with an additional resource for tattoo identification and confirming a recruit's possible gang affiliation. Local law enforcement has the best knowledge of gangs in their jurisdiction and these contacts will be a valuable addition to their toolbox.

(U) Department Of Defense Instruction (DODI) 1325.06, Handling of Dissident and Protest Activities Among Members of the Armed Forces, dated 22 February 2014, designates extremist group or gang participation as prohibited activities for US Armed Forces personnel and provides commanders the authority to take administrative and disciplinary actions for that participation. Active participation includes, but is not limited to, fundraising; demonstrating or rallying; recruiting, training, organizing, or leading members; distributing material (including posting on-line); knowingly wearing gang colors or clothing; having tattoos or body markings associated with such gangs or organizations; or otherwise engaging in activities in furtherance of the objective of such gangs or organizations that are detrimental to good order, discipline, or mission accomplishment or are incompatible with military service. In short, commanders are not required to wait until a crime occurs; they can take action based solely on evidence of active participation in a gang.

(U) US DOD, http://www.dtic.mil/whs/directives/corres/pdf/132506p.pdf

MCIO Contact Information
- AFOSI – hqafosi.watch@us.af.mil
- CID - Army.CID.Crime.Tips@mail.mil
- NCIS - http://www.ncis.navy.mil/ (Text Tip Web Tool link in the center of the homepage)

UNCLASSIFIED

# (U) Gang Involvement in Sex Trafficking and Prostitution

***(U) Definition:*** *Sex trafficking occurs when an adult is induced to engage in a commercial sex act as the result of force, fraud, or coercion, or when the person induced to engage in a commercial sex act has not attained 18 years of age. Prostitution is the unlawful promotion of, or participation in, sexual activities for profit, including solicitation attempts.*



(U) Source: Pixabay.com.

(U) As many gangs target juveniles for recruitment, they also target juveniles to engage in prostitution on behalf of the gang. Because these juveniles are under the age of 18, and therefore cannot legally consent, inducing them to engage in prostitution constitutes sex trafficking.

- (U) According to US Immigration and Customs Enforcement (ICE), a Thetford Avenue Buffalos gang member from Dorchester, Massachusetts, was sentenced to 153 months in prison and five years of supervised release for sex trafficking of minors. The gang member photographed a 14- and a 15-year-old girl in suggestive

poses and, using their photographs, created online advertisements for commercial sex.[58]

(U) According to the National Human Trafficking Resource Center, 3,598 cases of sex trafficking were reported in 2014 and 973 cases were reported in the first three months of 2015.[59] However, victims do not frequently report victimization because of shame or fear, and thus this number is likely an underestimation of sex trafficking cases in the United States. Approximately 15 percent of respondents to the street gang survey stated that gangs in their jurisdiction engage in human trafficking. This number is also likely an underestimation for two reasons: the aforementioned under reporting, and misclassifications whereby gang-involved cases are cited as prostitution, rather than sex trafficking, when a minor is involved. Law enforcement reporting indicates that gangs have increasingly engaged in sex trafficking over the past two years.

- (U) According to the Los Angeles, California, District Attorney's Office, a Long Beach gang member engaged in human trafficking in which the victim was forced to provide sex for money and give all profits to the gang. If the victim did not make $500 a day, she was threatened, beaten, and cut with a knife.[60]

UNCLASSIFIED

UNCLASSIFIED
### (U) Human Trafficking, Alien Smuggling, and Prostitution

| Human Trafficking | Alien Smuggling | Prostitution |
|---|---|---|
| Victims do not consent to their situation | Participants consent to being smuggled across border | Individuals involved consent to a commercial sexual transaction |
| Is forced exploitation of a person for labor or services* that the victim cannot or believes he or she cannot leave | Contract ends after border crossing | Contract ends after the sexual act is complete |
| Trafficking must have a commercial aspect but does not require movement of the victim | Smugglers must physically move the "customers" | Movement is irrelevant |
| Can be international or take place in a single country, no requirement to cross border | Is always international | Can occur anywhere |
| Crime against a person | Crime against the border | Crime against the state in most areas, legal in some limited areas |

*Under U.S. Law, if a person is under 18 and induced to perform a commercial sex act, then it is considered trafficking, regardless of whether fraud, force or coercion is involved.

**Source:** (U) US Department of State, "Fact Sheet: Distinctions between Human Smuggling and Human Trafficking 2006".

UNCLASSIFIED

- (U) In February 2015, three MS-13 members or associates were arrested for human trafficking in Fairfax County, Virginia. These arrests are consistent with a reported increase in gang-related human trafficking in Northern Virginia. Over the past year, 20 percent of the leads for the Fairfax County Police Department's Human Trafficking Unit were gang related.[61]

(U) Prostitution is commercial sex that – while usually illegal under state law – is a

UNCLASSIFIED

UNCLASSIFIED

consensual agreement between the two parties. Although prostitution is consensual, prostitution rings run by gangs victimize individuals by taking portions of their proceeds to advance the gang's objectives. According to survey respondents, gangs in approximately one-third of jurisdictions have moderate-to-high involvement in prostitution.[62]

- (U) According to a 2014 study conducted by the Urban Institute, four of eight major cities surveyed (Denver, Colorado; San Diego, California; Seattle, Washington; and Washington, DC) showed gangs were involved in sex trafficking. Six of the eight cities observed gang involvement in underground commercial sex economies in their jurisdiction.[63]

(U) Survey results indicate that over the past two years, gangs involved in sex trafficking and prostitution have collaborated with other gangs and criminals to maximize their profits and avoid law enforcement detection. Gangs work together to relocate trafficking victims and to exchange victims, which offers their clients variety in sexual partners and enables maximum profit. Victim exchange and relocation also helps gangs avoid law enforcement detection by preventing identification of victims.

- (U) In Denver, Colorado, there has been evidence of collaboration between rival gangs, the Crips and the Bloods, in order to maximize their sex trafficking and prostitution profits.[64]

UNCLASSIFIED

# (U) GANGS AND TECHNOLOGY

(U) Gang use of technology and social media has significantly increased over the past two years. Widely used social media platforms, such as Facebook and YouTube, have become ubiquitous in gang activity. According to survey respondents, the most common social media platforms that street gangs use are Facebook, YouTube, Instagram, and Twitter.[65] Gangs are also discovering and utilizing new platforms and applications on a daily basis. They use various sites, applications, and platforms for a multitude of reasons, including recruitment, communication, targeting rivals, advancing criminal activities, and thwarting law enforcement.

## (U) RECRUITMENT

(U) Social media sites provide gangs with a platform to recruit new members, either through direct communication or indirectly through videos that spread the gang's brand and boast the benefits of the gang lifestyle.

- (U) BMS, a combination of the Black MOB and Skanless gangs in California, used



**(U) Social Media Platforms Most Frequently Reported to be Used by Street Gang Members**

(U) Source: NAGIA Survey Data.

UNCLASSIFIED

social media sites like Instagram, Facebook, YouTube, and Twitter to lure unwitting young girls into the gang lifestyle with rap videos and promises of a glamorous life. These girls were then forced into sex trafficking.[66]

- (U) A member of a neighborhood-based gang in the Bronx, New York, posted rap videos on YouTube espousing violence and the gang lifestyle. In response, he received text messages containing requests to join the gang. For example, he received a text message stating, *"I'm from Queens but I watch all ya videos. Imma trying be down with the WTG Move."* The rapper responded *"you can be WTG under me and b official"* in exchange for $125.[67]

- (U) The BBE 900 gang in Cleveland, Ohio, invested illicit proceeds to create rap videos that were posted on social media sites and used to recruit new members, build the BBE 900 brand, and raise the intimidation factor.[68]

## (U) COMMUNICATION

(U) Gang members are increasingly moving to messaging platforms, such as Snapchat, kik, and WhatsApp to communicate. These technologies provide instantaneous



(U) Source: NAGIA Survey Data.

UNCLASSIFIED

UNCLASSIFIED

communication similar to Short Message Service (SMS) text messaging while providing more anonymity.

- (U) According to open source reporting, suspected MS-13 members in Virginia allegedly contacted a middle school student via kik, telling him to join MS-13 and provide names of other middle school students for recruitment.[69]



(U) Source: flickr.com

(U) Gangs rely on technology to stay connected to their counterparts and to help drive their illicit activities. This is particularly true for prison gangs that seek to obtain cell phones in order to access the outside world. Cell phones and social media platforms enable fast communication and coordination efforts among street gang members; between gang members in prison; and between prison and street members. In all of these instances, communication serves to enhance criminal operations and further gang objectives.

- (U) Approximately 90 percent of prison gang survey respondents indicate inmates in their facilities use at least one social media platform – Facebook, YouTube, Instagram, or Twitter – with Facebook being the most popular.[70]

- (U) According to a 2015 report, the Georgia Department of Corrections has reportedly confiscated 13,500 cell phones since 2012. The report claims that to combat the issue, Georgia Department of Corrections installed equipment to scan visitors for cell phones and other electronics. However, most of these cell phones were smuggled in by prison staff in exchange for cash or sex.[71]

- (U) Between the beginning of 2013 and April 2014, the California Department of Corrections and Rehabilitation discovered 14,960 contraband cell phones in prisons.[72]

- (U) The Mississippi Department of Corrections confiscated 2,257 cell phones across three prisons between the beginning of 2013 and April 2014. The department implemented a variety of preventive measures to reduce the number of cell phones in prisons, such as weekly searches for WiFi Internet signals; installing netting around prison perimeters; and increased searches using Managed Access Systems, Boss Chairs "body cavity detection systems," K-9 cell phone detector dogs, hand-wand metal detectors, and walk-through metal detection systems. The Mississippi Department of Corrections donated seized cell phones to non-profit groups, such as Cell Phones for Soldiers, crime victims, and domestic violence shelters.[73]

UNCLASSIFIED



(U) Source: California Department of Corrections and Rehabilitation
(U) Confiscated contraband cell phones.

## (U) TARGETING RIVALS

(U) Traditionally, gangs have demarcated their territory by spray painting their name, signs, and symbols on structures throughout their communities. As social media grows, gangs are using platforms, such as Facebook, Instagram, and YouTube, as "electronic graffiti walls." Messages and pictures posted on these electronic graffiti walls provide gangs new avenues to mark their territory and communicate messages to rivals while spreading the gang's name.

- (U) According to March 2015 open source reporting, a photo taken inside of a Georgia correctional facility showing a badly beaten inmate with a leash around his neck was uploaded to Facebook. The caption on the photo read, "When you disrespect the Nation, it brings nothing but pain and suffering."[74]

- (U) According to open source reporting, as of February 2015, the Nike and Jordan gangs in Omaha, Nebraska, used YouTube to create and post rap videos that disrespected each other. Depicted in the videos, gang members used gang signs, counted drug money, and brandished guns. At the end of some videos, they encouraged viewers to add them as friends on Facebook and followers on Twitter.[75]

## (U) Examples of Cell Phone Applications Exploited by Gang Members

| | |
|---|---|
|  | (U) Kik Instant Messenger is a free interactive communication application that allows users to share text messages, photographs, or videos. The application is similar to a texting feature on a phone; however, it only communicates over the Internet and uses usernames instead of phone numbers. |
|  | (U) Mobile Patrol is a free public safety application that connects a mobile telephone user to important safety information, news, and critical alerts. Users can receive traffic alerts, share crime tips, and access information about missing children and sex offenders. |
|  | (U) Rounds is a free social platform application that allows users to simultaneously video chat with up to 12 friends. Users can interactively watch YouTube videos, play interactive games, draw on whiteboards, and share photos. |
|  | (U) Glide is a free private messaging service where users can send video messages to several individuals simultaneously and the recipients can view the message instantly or at a later time. The video is transmitted to the end user the moment the video starts recording and can be streamed in almost real-time. |
|  | (U) OkHello is a free video chat service that allows users to create virtual rooms with friends. Users can share various types of media including photos and videos. |
|  | (U) Snapchat is a free media sharing application that allows users to take a picture or video, add a text caption, and send it to a friend. The picture or video will automatically be deleted from the server once viewed, but the recipient can take a screen shot and save the media to their phone. |

(U) Source: Google Play Store.

• (U) In late 2013, a senior member of the New Jersey Grape Street Crips used a social media account to identify a suspected cooperator in an Essex County, New Jersey, murder investigation. Several days after that social media post, members of the Grape Street Crips repeatedly shot and nearly killed the individual.[76]

## (U) CRIMINAL ACTIVITY

(U) Advancements in technology provide gangs new opportunities to target victims and carry out criminal activity.

• (U) The Georgia Department of Corrections reported that prison gangs are using cell phones as a new extortion tool and to plan crimes outside of prison, as well as to incite violence and extort family members of incarcerated rivals. Gang members allegedly text pictures of tortured inmates to family members and demand money in exchange for mercy.[77]

## (U) THWART LAW ENFORCEMENT

(U) Gangs exploit new technologies largely for the anonymity that messaging applications afford and for the pseudo-anonymity that comes with the use of aliases on social media. However, they also rely on these technologies to thwart law enforcement efforts.

• (U) Gang members are using advanced video messaging applications to communicate and possibly further their illegal activity. These video messaging applications are problematic and difficult for law enforcement to monitor because they enable ambiguity; transmit via the Internet; leave no record of transmission on the device; and allow users to save videos in cloud data storage. These applications are available to download for free on both the Apple App Store and the Android Google Play Store.

# (U) LAW ENFORCEMENT ACTIONS AND RESOURCES

(U) Investigative entities and intelligence units have long been vital in mitigating gang activity. Agencies at every level of law enforcement continue to join forces to combat gang violence, and remain committed to combating gangs, as gang activity continues to threaten communities nationwide.

(U) Technology is increasingly playing a pivotal role in police investigations and anti-gang efforts. Most police agencies today maintain gang databases whereby gang intelligence and gang-related crime statistics can be shared with law enforcement partners in other jurisdictions. Also, as gang members continue to exploit the Internet for criminal purposes, a growing number of law enforcement agencies are incorporating social media into their gang

investigations, specifically to identify gang members and monitor their criminal activity.

- (U) Approximately 65 percent of street gang survey respondents report that their agencies maintain gang databases, 45 percent of which are available to law enforcement partners.

- (U) Approximately 54 percent of agencies surveyed report that over the past two years, their organizations have integrated social media into their gang investigations. An additional 35 percent of respondents claim they have used social media for more than two years.



UNCLASSIFIED

## (U) Integration of Social Media Into Gang Investigations

- Incorporated Social Media Within The Past Two Years
- Did Not Incorporate Social Media
- Agency Has Been Using Social Media for Longer Than Two Years

UNCLASSIFIED

(U) Source: NAGIA Survey Data.

UNCLASSIFIED

(U) Due to efforts in gang suppression, intervention, and incarceration, violent and influential gang members have been removed from communities and incarcerated within state and federal correctional facilities, where many continue to direct criminal gang operations. While in prison, gang members form associations with other gang members and criminal enterprises in order to exploit opportunities for profit, expand their control, and establish communication networks which they use to conduct gang business. Consequently, investigators must keep pace with incarcerated gang members' growing sophistication and expanding criminal networks in order to effectively mitigate the threat; such efforts must include inter and intra-agency information sharing and policy updates, specifically those pertaining to prison security.

- (U) Over 90 percent of correctional agencies report that their agencies maintain gang databases, nearly 46 percent of which are accessible to law enforcement partners.

(U) The introduction of such contraband as drugs and cell phones remains a central issue in correctional institutions. Smuggling activities compromise the safety of both inmates and staff and can negatively impact communities in circumstances when gang members reach out to their street counterparts and direct criminal activity. As such, many facilities have used legislation or cell phone jamming technology to help prevent the introduction of cell phones.

- (U) Approximately 72 percent of survey respondents report having legislation in place designed to prohibit the introduction



UNCLASSIFIED

**(U) Jurisdictions With Legislation Prohibiting Cell Phones in Correctional Facilities**

- None
- Yes, Categorizing it as a Misdemeanor
- Yes, Categorizing it as a Felony

UNCLASSIFIED

(U) Source: NAGIA Survey Data.

UNCLASSIFIED

UNCLASSIFIED

of cell phones into a correctional facility. Most of the jurisdictions categorize the offense as a felony.

(U) The FBI has employed strategies to combat violent gangs on a national level since 1993. Currently, the FBI operates 164 FBI Violent Gang Safe Streets Task Forces across the United States. The FBI also maintains a Violent Gang Program that utilizes collection capabilities through multiple joint initiatives, such as the Correctional Intelligence Task Force and the Safe Streets Violent Crime Initiative. Additionally, the NGIC promotes multi-agency collaboration efforts to disrupt prison gang activity through information-sharing initiatives, such as the Joint Intelligence Sharing Initiative (JISI). JISI is a cooperative effort between the NGIC and BOP to develop and share intelligence that aids in the identification of criminal elements for prosecution. The NGIC also works closely with the Safe Streets and Gang Unit to provide direct case support to gang investigators and to assist FBI Safe Streets Gang Task Forces offices across the country.

## (U) Correctional Intelligence Task Force

(U) The Correctional Intelligence Task Force (CITF) is a joint task force comprised of the Federal Bureau of Investigation (FBI), California Department of Corrections and Rehabilitation (CDCR), and Federal Bureau of Prisons (BOP) that provides direct access to intelligence and information within CDCR and BOP for efficient collection, analysis, and dissemination of prison derived criminal activity. The mission is to systematically integrate intelligence and operations to initiate and enhance law enforcement suppression efforts through the identification, exploitation, and dissemination of cross-programmatic intelligence derived from correctional facilities.

# (U) Outlook

(U) Gangs of all types will persist in their objectives to generate illicit funds and control territory. And wherever they may fall short of their goals, gangs on a whole have the resources and motivations to find alternative avenues to meet their pursuits. Thus, gangs will continue to proliferate, evolve in their criminal abilities, and develop new tradecrafts to ensure their survival. Gangs will search relentlessly to increase their involvement in such lucrative crimes as prostitution and sex trafficking and will continue to explore opportunities to secure more territory.

(U) Gang leaders rely primarily on intimidation, assault, homicide, and other violent measures to dominate their subordinates and maintain territorial control. Most gangs employ aggressive tactics in order to protect their interests, as brute force is an effective means to their end. For that reason, gangs will remain driven by violence and will continue to compromise the safety of the communities they inhabit.

(U) Due to the violent and territorial nature of gangs, as well as their deep-rooted involvement in drug crimes, gangs will naturally continue to foster relationships with MTCOs and, wherever possible, will seek to heighten their role in drug trafficking. MTCO partnerships are integral to gang objectives as MTCOs supply gangs with access to corridors along the US/Mexico border and extend advantage in the illicit drug industry, all of which translates to money and power, the two primary objectives of gangs. Gang involvement in drug trafficking activities would diminish in the unlikely event that drug routes between the US and Mexico shut down, thereby restricting accessibility into the United States.

(U) In order to increase profit and widen their reach, gangs will strive to strengthen recruitment efforts; develop new methods to target rivals; and devise different techniques to thwart gang investigations. Formulating measures to target rivals and hinder law enforcement efforts could potentially lead to rival gangs joining forces; feasibly, collaborations may rise between gangs and other criminal organizations. Recruitment endeavors will inevitably compel gangs to keep spreading their ideology through such channels as the Internet.

(U) Street gangs will advance on pace with technology as members continue to exploit mechanisms that afford anonymity and instant communication, such as *SGP Technologies' Blackphone*[g] and *Apple* and *Google* cell phone systems that function to encrypt data. As social media sites, cell phone applications, and various other technological platforms progress, gangs will employ these methods to commit crimes without detection. [78,79] Gang utilization of evolving technology presents unique challenges for law enforcement.

(U) The long-standing culture of prison gangs will endure as incarcerated leaders continue to direct street crimes. The cycle between

---

[g] (U) The Blackphone is a smart phone developed by SGP Technologies that provides encryption, as well as other security privacy features for phone calls, e-mails, texts, and Internet browsing by accessing the Internet through a Virtual Private Network (VPN).

UNCLASSIFIED

prison and street practices will persist in that street gangs will keep financially supporting prison leaders in exchange for protection and education upon incarceration. As part of this succession, gang connections to drug suppliers and other criminal associations will continue to circulate from prison onto the streets and vice versa. Gang members – in prison and on the street – are criminals of opportunity and they will pursue every avenue to gain advantage in their illicit activities. Thus, street and prison gangs will keep working together to improve smuggling techniques, enhance communication efforts, and in any other capacity that will better enable them to meet their objectives. Law enforcement can expect to see a continuation in the relationship between street and prison gangs.

(U) Extremist behaviors and radicalization of incarcerated gang members will likely continue – and may even escalate – which could potentially increase violence in prison. The extreme rhetoric behind radicalization could spread to the streets and lead to a rise in animosity toward law enforcement and other government officials.

(U) Due to their unwavering motivation and ongoing access to various resources, gangs are not only postured to sustain their objectives, but hold tremendous potential to continue evolving and impacting streets and prisons across the nation. Gangs essentially pose a significant threat to law enforcement and to the communities in which they operate, and they show no signs of diminishing.

(U) Predictive analysis is not a viable mitigation strategy due to the erratic and volatile nature of gangs. In order to successfully mitigate the threat, law enforcement entities may require surges in investigative activity and intelligence collection efforts. Flexibility and innovations in strategy are therefore critical; no single initiative, investigative technique, statute, or preventive measure will necessarily be the most effective. For this reason, law enforcement must combine resources and techniques.

(U) Success in mitigation further requires an unprecedented level of collaboration and partnerships between all levels of law enforcement and community associates. Extensive liaising between street and corrections officials is essential to expand investigations, as is building cooperating witnesses; recruiting potential witnesses; and collecting intelligence to address the growing threat gangs pose at regional and national levels.

UNCLASSIFIED

# (U) ACKNOWLEDGEMENTS

*(U) The NGIC and NAGIA thank the below federal, state, local, and tribal law enforcement partners for completing the 2015 National Gang Report Survey.*

**Federal**
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Department of Homeland Security, Office for Bombing Prevention
Drug Enforcement Administration
El Paso Intelligence Center
Federal Bureau of Investigation
Federal Bureau of Prisons
Homeland Security Investigations
US Border Patrol
US Customs and Border Protection
US Department of State
US Marshals Service
US Probation Office

**Alabama**
Alabama Department of Corrections
Jefferson County Sheriff's Office
Northport Police Department

**Arizona**
Arizona Department of Juvenile Corrections
Arizona Department of Public Safety
Arizona Gang and Immigration Intelligence Team Enforcement Mission Gang Task Force
Arizona State Prison Complex Kingman
Central Arizona Detention Center - Corrections Corporation of America
Chandler Police Department
Cochise County Sheriff's Office
Florence Correctional Center - Corrections Corporation of America
Glendale Police Department
Juvenile Superior Court Durango
Lake Havasu City Police Department
Maricopa County Sheriff's Office
Mesa Police Department
Phoenix Police Department
Pima County Sheriff's Department - Corrections Bureau
Prescott Valley Police Department
Scottsdale Police Department
Tempe Police Department
Tucson Police Department

Yavapai County Juvenile Detention Center
Yuma Police Department

**Arkansas**
Arkansas Department of Correction
Benton County Sheriff's Office
Ozark Police Department
Russellville Police Department
Washington County Sheriff's Office

**California**
Alameda County Sheriff's Office
Alameda Police Department
Anaheim Police Department
Bakersfield Police Department
Berkeley Police Department
Butte County Probation Department
California Department of Corrections and Rehabilitation
Chico Police Department
City of South Gate
Concord Police Department
Eureka Police Department
Fresno Sheriff's Office
Fullerton Police Department
Imperial County Narcotics Task Force Gang Unit
Lake County Sheriff's Office
Long Beach Police Department
Los Angeles County District Attorney
Los Angeles County Probation
Los Angeles County Sheriff's Department
Los Angeles Police Department
Monterey Police Department
Morgan Hill Police Department
Napa County Probation
National City Police Department
Orange County Probation Department
Oxnard Police Department
Petaluma Police Department
Riverside County Sheriff's Department
Rohnert Park Department of Public Safety
Sacramento Sheriff's Department
San Benito County Probation Department
San Bernardino County Sheriff's Department

San Diego County Sheriff's Department
San Leandro Police Department
San Luis Obispo County Sheriff's Office Gang Task Force
Santa Ana Police Department
Santa Cruz County Anti-Crime Team
Santa Maria Police Department
Shasta County Probation Department
Sonoma County Sheriff's Office
South Lake Tahoe Police Department
Sutter County Sheriff's Office
Vallejo Police Department
West Sacramento Police Department
Whittier Police Department

**Colorado**
Arvada Police Department
Aurora Police Department
Colorado Department of Corrections
Colorado Department of Corrections - Division of
    Adult Parole
Denver Police Department
Fort Collins Police Services
Greeley Police Department
Lakewood Police Department
Longmont Police Department
Mesa County Sheriff's Office

**Connecticut**
Connecticut Department of Corrections
Connecticut State Police
Coventry Police

**Delaware**
Delaware Department of Correction
New Castle County Police Department

**District of Columbia**
Metropolitan Police Department

**Florida**
Bradenton Police Department
Brevard County Sheriff's Office
Florida Department of Corrections
Geo Group, Inc Corrections
Graceville Correctional Facility - GEO
Haines City Police Department
Hillsborough County Sheriff's Office
Jacksonville Beach Police Department
Lakeland Police Department
Leon County Sheriff's Office

Miramar Police Department
Okeechobee County Sheriff's Office
Sarasota County Sheriff's Office
Volusia County Sheriff's Office

**Georgia**
Atlanta Police Department
Chamblee Police Department
Coweta County Sheriff's Office
Dekalb Schools Department of Public Safety
Department of Juvenile Justice
Douglasville Police Department
Dublin Police Departent
Georgia Department of Corrections
Henry County Police Department
Jones County Sheriff's Office
Monroe Police Department
Office of the District Attorney, Middle Judicial Circuit
Rincon Police Department
Rockdale County Sheriff's Office
Social Circle Police Department
Spalding County Sheriff's Office

**Hawaii**
Hawaii Department of Public Safety

**Idaho**
Ada County Sheriff's Office
Idaho Department of Correction
Pocatello Police Department

**Illinois**
Champaign County State's Attorney
Chicago Police Department
Crawford County Sheriff's Office
Granite City Police Department
Jo Daviess County Sheriff's Office
Metropolitan Correctional Center, Chicago
Schaumburg Police Department

**Indiana**
Anderson Police Department
Boone County Sheriff's Office
Branchville Correctional Facility
Charlestown Police Department
Evansville Police Department
Indiana Department of Correction – Pendleton
    Correctional Facility
Indiana State Police
Lake County High Intensity Drug Trafficking Area

Porter County Sheriff's Department
South Bend Police Department

**Iowa**
Davenport Police Department
Dubuque County Sheriff's Office
Dubuque Police Department
Iowa Department of Corrections
Waterloo Police Department

**Kansas**
Wichita Police Department

**Kentucky**
Kentucky State Police
Marshall County Sheriff's Office
McCracken County Regional Jail

**Louisiana**
Calcasieu Parish Sheriff's Office
Louisiana Department of Corrections
Mandeville Police Department
Office of Juvenile Justice

**Maine**
Maine Department of Corrections
Maine Information and Analysis Center

**Maryland**
Berlin Police Department
Charles County Sheriff's Office
City of Takoma Park Police Department
Department of Public Safety and Correctional Services
Eastern Correctional Institution
Frederick County Detention Center
Frederick County Sheriff's Office
Frederick Police Department
Harford County Sheriff's Office
Maryland Coordination and Analysis Center
Maryland State Police
Washington County Narcotics Task Force
Wicomico County Department of Corrections

**Massachusetts**
Bristol County Sheriff's Office
Chicopee Police Department
Hampden County Sheriff's Department
Massachusetts Department of Correction
Springfield Massachusetts Police Department
Worcester County Sheriff's Office
Worcester Police Department

**Michigan**
Holland Department of Public Safety
Leelanau County Sheriff's Office
Michigan Department of Corrections - Ann Arbor Parole
Michigan State Police
Midland County Sheriff's Office
Troy Police Department
Unadilla Township Police Department

**Minnesota**
Coon Rapids Police Department
Minnesota Department of Corrections
St. Paul Police Department

**Mississippi**
Biloxi Police Department
Columbia Police Department
D'Iberville Police Department
Gulfport Police Department
Marion County Sheriff's Office
Mississippi Alcoholic Beverage Control
Mississippi Department of Corrections
Shannon Police Department

**Missouri**
Clay County Missouri Sheriff's Office
Columbia Police Department
Grain Valley Police Department
Kansas City Police Department
Missouri Board of Probation and Parole
Springfield Missouri Police Department
St. Louis County Police Department
St. Louis Metropolitan Police Department

**Montana**
Laurel Police Department
Montana Department of Corrections
Montana Department of Justice - Division of Criminal Investigation

**Nebraska**
Nebraska Department of Corrections
Omaha Police Department
Washoe County Sheriff's Office

**Nevada**
Las Vegas Metropolitan Police Department

**New Hampshire**
Belknap County Sheriff's Department
Keene Police Department

Merrimack County Department of Correction
Nashua Police Department
New Hampshire Department of Corrections

**New Jersey**
Bergen County Sheriff's Office
Burlington County Prosecutor's Office
Fairview Police Department
Kenilworth Police Department
Lawrence Township Police Department
Monmouth County Sheriff's Office - Corrections Division
Morris County Prosecutor's Office
Morris County Sheriff's Office
Old Bridge Township
Salem City Police Department
Salem County Sheriff's Department
Vineland Police Department
Voorhees Township Police Department
Winslow Township Police Department

**New Mexico**
Albuquerque Police Department
Farmington Police Department
Las Cruces Police Department
New Mexico Corrections Department
New Mexico High-Intensity Drug Trafficking Area
    Investigative Support Center

**New York**
Depew Police Department
Dutchess County Sheriff's Office
Monroe County Sheriff's Office
New York State Police
Newark Police Department
Oneida County Correctional Facility
Orange County Sheriff's Office
Rockville Centre Police Department

**North Carolina**
Alamance City County Gang Task Force
Cary Police Department
Charlotte Mecklenburg Police Department
Cumberland County Sheriff's Office
Duplin County Sheriff's Office
Forsyth County Sheriff's Office, Detention Division
Hickory Police Department
High Point Police Department
Kill Devil Hills Police Department
North Carolina Central University Police Department

North Carolina Department of Public Safety
North Carolina State Highway Patrol
Randleman Police Department
Shelby Police Department
Wilson Police Department
Winston-Salem Police Department

**North Dakota**
Fargo Police Department
North Dakota State and Local Intelligence Center

**Ohio**
Canton Police Department
Cincinnati Police Department
Cleveland Police Department
Dayton Police Department
Golf Manor Police Department
Great Parks of Hamilton County Rangers
Ottawa County Sheriff's Office
Wintersville Police Department

**Oklahoma**
Lawton Police Department
Oklahoma City Police Department
Oklahoma Department of Corrections

**Oregon**
City of Gresham
Corvallis Police Department
Forest Grove Police Department
Oregon Department of Corrections
Portland Police Bureau

**Pennsylvania**
Abington Township Police Department
Allentown Police Department
Berks County Jail System
Bern Township Police Department
Bethlehem City
Bristol Township
Brookville Police Department
Chester Township Police
City of Coatesville
Columbia Borough Police Department
Coopersburg Police Department
Cornwall Borough Police Department
Cumberland County District Attorney Drug Task Force
Cumberland County Prison
East Norriton Township Police Department
East Pennsboro Township

Ephrata Police Department
Hampden Township Police Department
Kennett Square Police Department
Kiskiminetas Township Police Department
Lancaster City Bureau of Police
Lancaster County Adult Probation and Parole
Lancaster County District Attorney
Lehigh County Gang Task Force
Lehighton Borough Police
Lock Haven City Police Department
Lower Allen Township Police Department
Lower Swatara Township Police Department
Luzerne County Adult Probation and Parole
Luzerne County Correctional Facility
Mahoning Township Police Department
Mechanicsburg Police Department
Mercer County Juvenile Probation Department
Montgomery County Adult Probation and Parole
Montgomery County Detective Bureau
New Holland Police Department
Norristown Police Department
Northampton County Department of Corrections
Northampton County Prison
Northumberland Borough Police Department
Northwest Lancaster County Regional Police Department
Parkesburg Borough Police Department
Patterson Township Police Department
Pennsylvania Board of Probation and Parole
Pennsylvania Department of Corrections
Pennsylvania State Police
Philadelphia Police Department
Pittsburgh Bureau of Police
Prince Gallitzin State Park
Quakertown Borough
Shenandoah Police Department
Sinking Spring Police Department
Solebury Township Police Department
Sullivan County Probation and Parole Department
Swarthmore Borough Police Department
Upper Allen Township Police Department
Upper Moreland Township Police Department
West Caln Township Police Department
West Grove Borough Police Department
West Pottsgrove Township Police Department
West Reading Police Department
West Sadsbury Township Police Department
West York Borough Police Department

Wilkes-Barre City Police Department

**Rhode Island**
Rhode Island State Police

**South Carolina**
Conway Police Department
Darlington County Sheriff's Office
Perry Police Department
Rock Hill Police Department
South Carolina Department of Corrections
South Carolina Department of Probation, Parole and Pardon
    Services
Spartanburg County Sheriff's Office
West Columbia Police Department

**South Dakota**
South Dakota Division of Criminal Investigation

**Tennessee**
Bristol Tennessee Police Department
Haywood County Sheriff's Department
Knox County Sheriff's Office
Knoxville Police Department
Tennessee Bureau of Investigation
Tennessee Department of Correction

**Texas**
34th Judicial District Attorney's Office
Arlington Police Department
Baytown Police Department
Carrollton Police Department
Coastal Bend Detention Center
Corpus Christi Police Department
Dallas Independent School District Police Department
Dallas Police Department
Directorate of Emergency Services, Fort Bliss Texas
El Paso County Sheriff's Office
El Paso Police Department
Fort Worth Police Department
Guadalupe County Sheriff's Office
Hood County Sheriff's Office
Houston Police Department
Irving Police Department
Longview Police Department
Mansfield Police Department
Nacogdoches County Sheriff Department
Nacogdoches Police Department
San Marcos Police Department
Texas Alcoholic Beverage Commission

Texas Department of Criminal Justice - Office of the
  Inspector General
Texas Department of Public Safety

**Utah**
Utah Department of Public Safety

**Vermont**
Barre Probation and Parole
Bennington Probation and Parole
Brattleboro Probation and Parole
Newport Probation and Parole
Northeast Correctional Complex
Northern State Correctional Facility
Northwest State Correctional Facility
Rutland Probation and Parole
Southeast State Correctional Facility
Springfield Probation and Parole
St. Johnsbury Probation and Parole
Vermont Department of Corrections

**Virginia**
Abingdon Police Department
Chesapeake Police Department
City of Alexandria Police
Danville Police Department
Fairfax County Police Department
Halifax/South Boston Narcotics and Gang Task Force
Hampton Police Division
Harrisonburg Police Department
Henrico County Police Division
Loudoun County Sheriff's Office
Newport News Police Department
Portsmouth Police Department
Prince William County Police Department
Richmond Police Department
Spotsylvania County Sheriff's Office
Virginia Department of Corrections
Virginia Department of Juvenile Justice
Virginia State Police
York Poquoson Sheriff's Office

**Washington**
City of Burlington
Everett Police Department
Grant County Sheriff's Office
Lynnwood Police Department
Northwest Detention Center--Geo Group
Puyallup Police Department
Seattle Police Department

Spokane County Sheriff's Office
Spokane Regional Safe Streets Task Force
Tacoma Police Department
Walla Walla Police Department
Washington State Department of Corrections

**West Virginia**
Martinsburg Police Department
Philippi Police Department
West Virginia Fugitive Task Force

**Wisconsin**
Blair Police Department
City of Madison Police Department
Grand Chute Police Department
Green Bay Police Department
Janesville Police Department
La Crosse Police Department
Newburg Police Department
Phillips Police Department
Seymour Police Department
Sheboygan County Sheriff's Office
Sun Prairie Police Department
Village of Pepin Police Department
Wisconsin Department of Corrections

**Wyoming**
Cheyenne Police Department
Torrington Police Department
Weston County Detention Center
Weston County Sheriff's Office
Wyoming Department of Corrections
Wyoming Division of Criminal Investigation
Wyoming Highway Patrol

*(U) The NGIC and NAGIA thank the below Safe Streets and Gang Task Forces for completing the 2014 FBI Safe Streets and Gang Task Force Survey.*

**North Central Region**
Joint Task Force on Gangs (Chicago)
Canton Resident Agency Safe Streets Task Force
Detroit Violent Gang Task Force
Eastern Illinois Safe Streets Task Force
Genesee County Safe Streets Task Force
Greater Omaha Safe Streets Task Force
Greater Racine Gang Task Force
Kansas City Metropolitan Gang Task Force
Kentucky Safe Streets Task Force
Peoria Area Safe Streets Task Force
Quad Cities Federal Gang Task Force
Southern Ohio Safe Streets Task Force
Twin Cities Safe Streets Violent Gang Task Force
Violent Gang Safe Streets Task Force (St. Louis)
Wabash Valley Safe Streets Task Force

**Northeast Region**
Capital District Safe Streets Gang Task Force
Bridgeport Safe Streets Gang Violent Crime Task Force
Eastern Panhandle and Potomac Highlands Safe Streets Task Force
Greater Pittsburgh Safe Streets Task Force
Hudson Valley Safe Streets Task Force
New Hampshire Safe Streets Gang Task Force
New Haven Safe Streets Task Force
New York City Metro Gang Task Force
Newark Violent Crime Criminal Enterprise Task Force
North Shore Gang Task Force
Northern Connecticut Violent Crime Gang Task Force
Rhode Island Violent Crime Gang Task Force
Safe Streets Task Force (Buffalo)
South Jersey Violent Incident/Gang Task Force
Southeastern Massachusetts Safe Streets Gang Task Force
Southern Maine Gang Safe Streets Task Force
Southwest Pennsylvania Safe Streets Task Force
Violent Crimes Incident Task Force
Westchester County Safe Streets Task Force
Western Massachusetts Safe Streets Gang Task Force

**South Central Region**
Austin Safe Streets Task Force
Capitol Area Task Force

Central Alabama Safe Streets Task Force
Corpus Christi Violent Crimes Task Force
El Paso Safe Streets and Prison Gang Task Force
Houston Coastal Safe Streets Task Force
Jackson Safe Streets Task Force
Metrock Safe Streets Task Force
Mobile Safe Streets Task Force
Multi-Agency Gang Task Force
Nashville Violent Crime Gang Task Force
North Alabama Safe Streets Task Force
Northwest Louisiana Violent Crime Task Force
Oklahoma City Metropolitan Gang Task Force
Rio Grande Valley Violent Crime Task Force
San Antonio Safe Streets Task Force
South Central Louisiana Gang Task Force
Southeast Mississippi Safe Streets Task Force
SSCH Chattanooga Safe Streets Task Force
Violent Crimes, Major Offenders, & Gang Task Force (Dallas)
West Texas Area Major Offenders Task Force

**Southeast Region**
Atlanta Criminal Enterprise Task Force
Charlotte Safe Streets Task Force
Columbia Violent Gang Task Force
Conasauga Safe Streets Task Force
Criminal Enterprise Investigative Task Force, Jacksonville Division
Cross Border Task Force - Safe Streets (Prince George's County, Maryland)
Delaware Violent Crime Safe Streets Task Force
Fajardo Regional Enforcement Team
FBI/MPD Safe Street Task Force
Metro Orlando Safe Street Gang Task Force
NW Georgia Criminal Enterprise Task Force
Pee Dee Gang and Violent Crime Task Force
Philadelphia Violent Gang Task Force
Piedmont Triad Safe Streets Task Force
Raleigh-Durham Safe Streets Task Force
Richmond Area Violent Enterprise
San Juan Safe Streets Task Force
South Florida Street Gangs and Criminal Organization Task Force

Tampa Bay Safe Streets Gang Task Force
Tidewater Violent Crimes Task Force
Wilmington Safe Streets Task Force

**West Region**
Albuquerque Safe Streets HIDTA Gang Task Force
Big Sky Safe Streets Task Force
Central Coast Safe Streets Task Force
Denver Metro Gang Safe Streets Task Force
East County Regional Gang Task Force
Hawaii Safe Streets Task Force
Las Vegas Safe Streets Gang Task Force
Los Angeles Metropolitan Task Force on Violent Gangs
North Bay Regional Gang Task Force
North Central Coast Gang Task Force
North County Regional Gang Task Force
Northern Utah Criminal Apprehension Team
Riverside Resident Agency Gang Impact Team
Sacramento Valley Gang Suppression Team
Safe Streets Task Force (Anchorage)
Safe Streets Task Force East Bay
Santa Clara County Violent Gang Task Force
Seattle Safe Streets Task Force
South Los Angeles County Violent Crime Task Force
South Sound Gang Task Force
Southern Colorado Violent Gang Safe Streets Task Force
Southern New Mexico Safe Streets Violent Gang Task Force
Southwest Arizona Safe Streets Task Force
Stockton Violent Crime Gang Task Force
Violent Crimes Task Force - Gang Group (San Diego)
Violent Gang Safe Streets Task Force (Portland)
Violent Street Gang Task Force (Phoenix)

# (U) Appendix A

**(U) Map of NAGIA's 2015 National**



* Respondents mapped using each unique address provided.

UNCLASSIFIED

**Gang Report Survey Respondents**



UNCLASSIFIED

# (U) Appendix B

**(U) Map of Safe Streets and**



West Region |
40 Task Forces

North Central Region |
32 Task Forces

South Central Region |
29 Task Forces

Northeast Region |
32 Task Forces

Southeast Region |
31 Task Forces

**Gang Task Force Regions**



# (U) ENDNOTES

1   (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 12.
2   (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 12.
3   (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 11.
4   (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 14.
5   (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 15.
6   (U) Federal Bureau of Investigation; 2014 FBI Safe Streets and Gang Task Force Survey.
7   (U) Press Release; US Attorney's Office, District of Minnesota; 4 March 2015; "Seven Members of Minneapolis-Based Gang Charged in 31-Count Indictment with Conspiracy to Distribute Crack Cocaine Throughout Minnesota;" available at http://www.fbi.gov/minneapolis/press-releases/2015/seven-members-of-minneapolis-based-gang-charged-in-31-count-indictment-with-conspiracy-to-distribute-crack-cocaine-throughout-minnesota.
8   (U) Online Article; "Gang Brought $10 Million in Drugs through Tulsa, Feds Say;" 20 August 2014; available at www.tulsaworld.com.
9   (U) Press Release; US Attorney's Office, Western District of North Carolina; 22 April 2015; "Federal Indictment Charges 12 United Blood Nation Gang Members with Racketeering Conspiracy;" available at https://www.fbi.gov/charlotte/press-releases/2015/federal-indictment-charges-12-united-blood-nation-gang-members-with-racketeering-conspiracy.
10  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 21.
11  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 22.
12  (U) Press Release; US Attorney's Office, Southern District of California; 08 January 2014; "North Park Gang Members Indicted in Racketeering Conspiracy;" available at http://www.fbi.gov/sandiego/press-releases/2014/north-park-gang-members-indicted-in-racketeering-conspiracy.
13  (U) Online News Article; "PD: Gang may have targeted Salt River officer in deadly shooting;" 13 June 2014; available at http://www.kpho.com/story/25654490/pd-gang-targeted-salt-river-officer-in-deadly-shooting.
14  (U) Online News Article; "Prosecutor's Dad Kidnapped in Elaborate Plot FBI Rescues Him;" 11 April 2014; available at http://www.cnn.com/2014/04/10/justice/kidnap-fbi-atlanta/.
15  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 18.
16  (U) Online News Article; "Detroit Police Chief Answers Gang Member's Death Threat;" 24 February 2014; available at http://www.usatoday.com/story/news/nation/2014/02/24/detroit-police-chief-death-threat/5772937/.
17  (U) Online News Article; "Threat States Rogers "Cop Will Be Killed" On New Year's Eve;" 29 December 2014; available at http://5newsonline.com/2014/12/29/threat-states-rogers-cop-will-be-killed-on-new-years-eve/.
18  (U) Internet Site; US Department of Justice; Prison Gangs: Prison Gangs and Photos; 18 April 2013; available at http://www.justice.gov/criminal/ocgs/gangs/prison.html.
19  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 12.
20  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 11.
21  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 11.
22  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 11.
23  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 18.
24  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 18.
25  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 18.
26  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 18.
27  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 19.
28  (U) Federal Bureau of Investigation; 2014 FBI Safe Streets and Gang Task Force Survey.
29  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 18.
30  (U) Online News Article; "Jail Corruption Case Appears Similar to Gang Infiltration in Prison in 2009;" 25 April 2013; available at http://www.washingtonpost.com/local/jail-corruption-case-appears-similar-to-gang-infiltration-in-prison-in-2009/2013/04/25/6efb61d2-add9-11e2-a986-eec837b1888b_story.html.
31  (U) Online News Article; "Insiders Say Prison Gangs and Crooked Guards Corrupting State's Prisons;" 24 September 2014; available at http://www.orlandoweekly.com/Blogs/archives/2014/09/24/insiders-say-prison-gangs-and-crooked-guards-corrupting-states-prisons.
32  (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 19.
33  (U) Online News Article; "Insiders Say Prison Gangs and Crooked Guards Corrupting State's Prisons;" 24 September 2014; available at http://www.orlandoweekly.com/Blogs/archives/2014/09/24/insiders-say-prison-gangs-and-crooked-guards-corrupting-states-prisons.
34  (U) Press Release; US Attorney's Office, District of Maryland; "Two Former Correctional Officers Sentenced to Prison for a Racketeering Conspiracy;" 12 March 2015; available at https://www.fbi.gov/baltimore/press-releases/2015/two-former-correctional-officers-sentenced-to-prison-for-a-racketeering-conspiracy.
35  (U) Online News Article; "Mississippi Prisons: Guards, Low Pay, and Corruption;" 6 October 2014; available at http://www.clarionledger.com/story/news/2014/10/05/miss-prisons-guards-low-pay-corruption/16789393/.
36  (U) Federal Bureau of Investigation; 2014 FBI Safe Streets and Gang Task Force Survey.

37 (U) Press Release; US Department of Justice; "Six Leaders and Members of Phantom Outlaw Motorcycle Club and Vice Lords Street Gang Convicted of Violent Racketeering-related Crimes;" 16 March 2015; available at http://www.fbi.gov/detroit/press-releases/2015/six-leaders-and-members-of-phantom-outlaw-motorcycle-club-and-vice-lords-street-gang-convicted-of-violent-racketeering-related-crimes.

38 (U) Online News Article; "Nine dead in Waco, Texas biker brawl;" 17 May 2015; available at http://www.cnn.com/2015/05/17/us/texas-shooting/index.html.

39 (U) Press Release; US Department of Justice; "Leader of Salem Hells Angels Pleads Guilty to Federal Crimes in Connection with Brutal Assault;" 13 February 2015; available at http://www.fbi.gov/boston/press-releases/2015/leader-of-salem-hells-angels-pleads-guilty-to-federal-crimes-in-connection-with-brutal-assault.

40 (U) Online News Article; "Georgia man arrested in deadly Birmingham biker club shooting;" 31 August 2014; available at http://www.al.com/news/birmingham/index.ssf/2014/09/arrest_made_in_birmingham_bike.html.

41 (U) Online News Article; "Uncooperative Witnesses In Applebee's Shooting Impede Police Investigation;" 31 March 2015; available at http://www.kob.com/article/stories/s3751395.shtml.

42 (U) Online News Article; "TEMECULA: No Arrests in Bloody Biker Brawl on I-15," 7 April 2014; available at http://www.pe.com/articles/hells-693535-angels-motorcycle.html.

43 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Outlaw Motorcycle Gangs Survey, question 13.

44 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Outlaw Motorcycle Gangs Survey, question 7.

45 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Border Gangs Survey.

46 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Border Gangs Survey.

47 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 27, Prison Gangs Survey, questions 13, 15, and 16, Outlaw Motorcycle Gang Survey, question 16 and Border Gangs Survey, question 9.

48 (U) Federal Bureau of Investigation; 2014 FBI Safe Streets and Gang Task Force Survey.

49 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, questions 13, 15, and 16.

50 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, questions 13, 15, and 16.

51 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 29 and Prison Gangs Survey, question 17.

52 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Outlaw Motorcycle Gangs Survey, question 17.

53 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Prison Gangs Survey, question 30 and Outlaw Motorcycle Gangs Survey, question 21.

54 (U) Virginia Department of Corrections; Gang and Security Threat Group; Electronic Communication, 25 March 15.

55 (U) Online News Article; "Air Force captain convicted of leading violent street gang;" 02 February 2015; available at http://www.usatoday.com/story/news/nation/2015/02/02/airforcecaptain-sentenced/22762041.

56 (U) Online News Article; "Outlaw Biker Gangs Prize U.S. Soldiers, Feds Say;" 26 May 2015; available at http://www.nbcnews.com/news/us-news/omg-motorcycle-gangs-recruit-military-soldiers-n364731.

57 (U) Online News Article; "Memphis police officer appears in controversial music video;" 01 December 2014; available at http://www.wmcactionnews5.com/story/27520849/memphis-police-officer-appears-in-controversial-music-video.

58 (U) News Release; US Immigration and Customs Enforcement; "Dorchester Gang Member Sentenced to Over 12 Years in Prison for Sex Trafficking Minors;" 11 May 2015; available at http://www.ice.gov/news/releases/dorchester-gang-member-sentenced-over-12-years-prison-sex-trafficking-minors.

59 (U) Internet Site; National Human Trafficking Resource Center; "Sex Trafficking;" 26 June 2015; available at http://www.traffickingresourcecenter.org/type-trafficking/sex-trafficking.

60 (U) Press Release; Long Beach Police Department; "Specialized Program Leads to Arrest of Human Trafficking Suspect;" 28 May 2015; available at http://www.longbeach.gov/Police/Press-Releases/SPECIALIZED-PROGRAM-LEADS-TO-ARREST-OF-HUMAN-TRAFFICKING-SUSPECT/.

61 (U) Online News Article; "Reston Gang Members Charged with Human Trafficking;" 11 March 2015; available at http://www.fairfaxtimes.com/article/20150311/NEWS/150319743/reston-gang-members-charged-with-human-trafficking&template=fairfaxTimes.

62 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 15.

63 (U) The Urban Institute; Research Report; "Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities;" March 2014; available at http://www.urban.org/sites/default/files/alfresco/publication-pdfs/413047-Estimating-the-Size-and-Structure-of-the-Underground-Commercial-Sex-Economy-in-Eight-Major-US-Cities.PDF.

64 (U) The Urban Institute; Research Report; "Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities;" March 2014; available at http://www.urban.org/sites/default/files/alfresco/publication-pdfs/413047-Estimating-the-Size-and-Structure-of-the-Underground-Commercial-Sex-Economy-in-Eight-Major-US-Cities.PDF.

65 (U) National Alliance of Gang Investigators' Associations; 2015 National Gang Survey; Street Gangs Survey, question 35.

66 (U) Press Release; US Attorney's Office, Southern District of California; 08 January 2014; "North Park Gang Members Indicted in Racketeering Conspiracy;" available at http://www.fbi.gov/sandiego/press-releases/2014/north-park-gang-members-indicted-in-racketeering-conspiracy.

67  (U) Online News Article; "Seeking Clues to Gangs and Crime, Detectives Monitor Internet Rap Videos;" 07 January 2014; available at http://www.nytimes.com/2014/01/08/nyregion/seeking-clues-to-gangs-and-crime-detectives-monitor-internet-rap-videos.html?_r=0.

68  (U) Cuyahoga County Prosecutor's Office; Statement by First Assistant Cuyahoga County Prosecutor Duane Deskins on Law Enforcement's Targeting of the BBE 900 Gang; 29 October 2014; available at http://prosecutor.cuyahogacounty.us/en-US/2014-10-29-pr-statement-on-targeting-bbe-900-gang.aspx.

69  (U) Online News Article; "Possible Gang Members Attempt Recruitment of Sterling Middle Students;" 01 May 2015; available http://www.loudountimes.com/news/article/possible_gang_members_attempt_recruitment_of_sterling_middle_students323.

70  (U) National Alliance of Gang Investigators' Association; 2015 National Gang Survey; Prison Gangs Survey, question 25

71  (U) Online News Article; "New Trend Alert: Prison Culture Exposed Through Cell Phone Extortion;" 01 April 2015; available at http://www.ebengregory.com/2015/04/01/new-trend-alert-prison-culture-exposed-cell-phone-extortion-pic/.

72  (U) California Department of Corrections and Rehabilitation; Fact Sheet; "Contraband Cell Phones in CDCR Prisons and Conservation Camps;" April 2014; available at http://www.cdcr.ca.gov/Contraband-Cell-Phones/docs/Contraband-Cell-Phone-Fact-Sheet-April-2014.pdf.

73  (U) Press Release; Mississippi Department of Corrections; "MDOC Makes Good Use of Contraband Cell Phones;" 11 April 2014; available at http://www.mdoc.state.ms.us/PressReleases/2014NewsReleases/MDOC%20MakesGoodUseOfContraband.pdf.

74  (U) Online News Article; "Mom's fury as ten men launch gang attack on her son, 18, in a prison cell-then tie a LEASH round his neck and pose for a Facebook photo despite being behind bars;" 31 March 2015; available at http://www.dailymail.co.uk/news/article-3020842/Mom-horrified-Facebook-photo-emerges-beaten-18-year-old-son-prison-cell-eye-swollen-shut-lead-two-men-standing-him.html.

75  (U) Online News Article; "Gang Violence Fueled by Gang Members by Clicks on Social Media," 02 February 2015; available at http://www.omaha.com/news/crime/gang-violence-fueled-by-clicks-on-social-media/article_b7da3145-b853-5ea3-9b52-6cda881a5c1a.html.

76  (U) Press Release; US Department of Justice; "Seventy-One Defendants Charged in Long-Running Investigation of Grape Street Crips Street Gang;" 20 May 2015; available at http://www.fbi.gov/newark/press-releases/2015/seventy-one-defendants-charged-in-long-running-investigation-of-grape-street-crips-street-gang.

77  (U) Online News Article; "New Trend Alert: Prison Culture Exposed Through Cell Phone Extortion;" 01 April 2015; available at http://www.ebengregory.com/2015/04/01/new-trend-alert-prison-culture-exposed-cell-phone-extortion-pic/.

78  (U) Online News Article; "New Level of Smartphone Encryption Alarms Law Enforcement;" 22 September 2014; available at http://www.wsj.com/articles/new-level-of-smartphone-encryption-alarms-law-enforcement-1411420341.

79  (U) Online Article; "Could The Highly-Encrypted & Tap-Proof 'Blackphone' Be Used By Criminals;" available at http://vanityleague.com/highly-encrypted-blackphone/.

UNCLASSIFIED

UNCLASSIFIED

UNCLASSIFIED